DEPARTMENT OF INDUSTRIAL RELATIONS
DIVISION OF LABOR STANDARDS ENFORCEMENT

| | |
|---|---|
| **DISTRICT OFFICE** | 10 |
| **TAKEN BY** | la |

**PLAINTIFF:**

DAVID R. LOERA

**DEFENDANT:**   Akal Security, Incorporated, a New Mexico Corporation

DOES I
THROUGH V,
Defendant(s)

| CASE NO. 10-54558    LA | COMPLAINT |
|---|---|

**PLAINTIFF ALLEGES:**

1. He is _____ employed by the defendant named above to perform personal services as:   Security Officer _____

2. for the period   12-26-02 _____ to   current _____

3. in the County of _____ Imperial _____ , California; under the terms of ____ an oral ____ agreement, at the
promised rate of compensation of:
$18.77 per hour effective 1-1-03 and $23.23 per hour effective 1-2-04 _____

_____

4. that there is due, owing and payable from the defendant to the plaintiff an amount as and for wages, penalties
and/or other demands for compensation:

☒   a.   as shown in attached Exhibit A, incorporated herein;

☒   b.   as set out below:

Unpaid rest period premium pay for the period 1/1/03 through 12/28/03, being 245 days at 1 hour of pay per day at the rate of
$18.77 per hour, totals $4,598.65.
Unpaid rest period premium pay for the period 1/2/04 through 5/22/04, being 95 days at 1 hour of pay per day at the rate of
$23.23 per hour, totals $2,206.85.
Unpaid meal period premium pay for the period 1/1/03 through 12/28/03, being 245 days at 1 hour of pay per day at the rate of
$18.77 per hour , totals $4,598.65.
Unpaid meal period premium pay for the period 1/2/04 through 5/22/04, being 95 days at 1 hour of pay per day at the rate of
$23.23 per hour , totals $2.206.85.

☐   c.   And also alleging additional wages accrued pursuant to Labor Code Section 203 as a penalty of ............... per day
for an indeterminate number of days not to exceed thirty days.

☐   d.   And also alleging additional wages accrued pursuant to Labor Code Section 203.1, as a penalty of ...........................
per day for issuance of an insufficient payroll check for an indeterminate number of days not to exceed thirty days.

Interest pursuant to Labor Code Section 98.1. and/or 2802.

**PLAINTIFF CERTIFIES THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF HIS/HER KNOWLEDGE AND BELIEF.**

Executed at _____ El Centro _____ , County of _____ Imperial _____ , California

Dated:   12/03/04 _____

_____ Signature of Plaintiff _____

DLSE 530 (REV 7/98)                     COMPLAINT                     L. C. 98

343 D

05/24/2006  11:48  760339  5                          EDD                                        PAGE  02



**AKAL SECURITY, INC.   INS PAYROLL ACCOUNT**

# Statement of Earnings

### Akal Security Inc.

Check Date: 5/19/2006    Check #: 62253
Pay Period: 4/30/2006 THRU 5/13/2006

Loera, David    SSN: ***-**-8531    Employee Type: Full Time - Unarmed    Exemptions: Fed S 01 State S 05    Employee #: 53145

| Description | CURRENT Rate | Hours | Earnings | YTD Hours | YTD Earnings | Description | This Period | YTD | Description | This Period | YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Guard - Regular | 24.640 | 76.00 | 1872.64 | 720.00 | 12714.00 | | | | Federal W/H | 352.02 | 2622.81 |
| Guard - Regular | 23.700 | 4.00 | 94.80 | 4.00 | 147.66 | | | | FICA | 133.22 | 1317.01 |
| Overtime | 36.915 | 4.00 | 147.66 | 40.00 | 942.50 | | | | Medicare | 31.16 | 308.01 |
| Guard Holiday Not Worked | | | | 32.00 | 1079.40 | | | | CA W/H | 110.07 | 1089.00 |
| Guard Holiday Worked | | | | 60.00 | 948.00 | | | | CA State Disa | 17.19 | 189.94 |
| Guard Sick/Personal | | | | | | | | | | | |
| | | | | | | | | | Total | 643.66 | 5486.77 |
| | | 84.00 | 2115.10 | 838.00 | 20880.48 | | | | | | |

| | | | | | | Description | This Period | YTD | Description | 4/16/2006 | YTD Thru 4/29/2006 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | Vacation | |
| Description | CURRENT Rate | Hours | Earnings | YTD Hours | YTD Earnings | | | | Begin | 0.00 | |
| Uniform - ICE | 0.4200 | 80.00 | 33.60 | 752.00 | 315.84 | | | | Accrued | 0.00 | 0.00 |
| | | | | | | | | | Used | 0.00 | 0.00 |
| | | | | | | | | | Hours Lost | 0.00 | 0.00 |
| | | | | | | | | | Cash Out | 0.00 | 0.00 |
| | | | | | | | | | Adjustments | 0.00 | 0.00 |
| Total | | 80.00 | 33.60 | 752.00 | 315.84 | | | | Balance | 0.00 | |

| | | | | | | Description | This Period | YTD | | Sick / Personal | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Description | CURRENT Rate | Hours | Earnings | YTD Hours | YTD Earnings | Union-SPFPA-Ld | 289.45 | | Begin | 0.00 | 0.00 |
| H&W Prev Wg - ICE/EI Cent | 3.7500 | 80.00 | 300.00 | 792.00 | 2958.00 | | | | Accrued | 0.00 | 40.00 |
| H&W Prev Wg - ICE/EI Cent | 3.7500 | 80.00 | -300.00 | 792.00 | -2958.00 | | | | Used | 0.00 | 0.00 |
| Pension Prev Wg - ICE/EI | 1.2200 | 80.00 | 97.60 | 752.00 | 917.44 | | | | Hours Lost | 0.00 | 0.00 |
| Pension Prev Wg - ICE/EI | 1.2200 | 80.00 | 97.60 | 752.00 | 917.44 | | | | Cash Out | 0.00 | 0.00 |
| | | | | | | | | | Adjustments | 0.00 | 0.00 |
| | | | | | | | | | Balance | 0.00 | |

| | Gross Earnings | FICA Taxable | Federal Taxable | Taxes | Other Deductions | Net Pay | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Current | 2146.70 | 2146.70 | 2146.70 | 643.66 | 0.00 | 1508.04 | | Total | 289.45 | | |
| | | | | | 289.45 | 14465.76 | | | | | |

344 D

Collective Bargaining Agreement

Between

AKAL SECURITY, INCORPORATED

and the

SECURITY, POLICE, AND FIRE PROFESSIONALS OF AMERICA

Amalgamated Local #165

345 D

## PREAMBLE

THIS AGREEMENT is made and entered by and between AKAL SECURITY, INCORPORATED, a New Mexico corporation, hereinafter referred to as the "Employer" or "Company," and Security, Police, and Fire Professionals of America (SPFPA), on behalf of its Local # 165, hereinafter referred to as the "Union".

2

346 D

# ARTICLE 1

## GENERAL PROVISIONS

### SECTION 1.1 BARGAINING UNIT

This agreement is entered between Akal Security, Inc., and SPFPA, Local # 165 (hereinafter referred to as the Union). The Company recognizes the Union as the sole and exclusive bargaining representative for the purpose of collective bargaining as defined in the National Labor Relations Act.

The unit is defined as all full-time and part time position Custody Officer and Lead Custody Officers employed by the Company at the INS Service Processing Center, El Centro, California, excluding all other employees including office clerical employees and professional employees as defined in the National Labor Relations Act.

This agreement shall be binding upon both parties, their successors and assigns. In the event of a sale or transfer of the business of the employer, or any part thereof, the purchaser or transferee shall be bound by this agreement.

### SECTION 1.2 NEGOTIATING COMMITTEE

The Company agrees to recognize a Negotiating Committee composed of up to four members and one alternate selected by the Union to represent the Employees in collective bargaining negotiations.

### SECTION 1.3 STEWARD SYSTEM

A.  The Company agrees to recognize a steward system.

B.  The Union agrees that the stewards will work at their regular jobs at all times except when they are relieved to attend to the business of the Grievance Procedure as outlined in this Agreement. Aggrieved employees will be paid their regular rate of pay in the conduct of Company Union business during scheduled working hours.

C.  If the Employee requests, the Company will call for a steward prior to any disciplinary action taken, whether it be written or verbal. The supervisor will release the steward as soon as possible. The Union Steward will be paid for time spent in the regard, upon receiving Supervisor approval of relief from duty.

### SECTION 1.4 MANAGERS AND SALARIED PERSONNEL

Managerial and salaried Employees shall not perform the duties of the Employees in the bargaining unit, except in an emergency.

347 D

## SECTION 1.5 CLASSIFICATIONS

A. Full-time Employees are those Employees who are scheduled to work fourty (40) hours per week and regularly work thirty-two (32) hours or more a week.

B. Part-time Employees are those Employees who are scheduled to regularly work less than thirty-two (32) per week.

C. Employees covered by this agreement shall not be required to deliver office supplies, furniture, equipment, or distribution that does not pertain to normally assigned duties.

D. Employees covered by this Agreement shall not be required to perform janitorial service other than to clean up or pick up after themselves.

## SECTION 1.6 UNION SECURITY

A. An Employee who is a member of the Union at the time this Agreement becomes effective shall continue membership in the Union for the duration of this Agreement, to the extent of tendering the membership dues uniformly required as a condition of retaining membership in the Union.

B. An Employee who is not a member of this Union at the time that this Agreement becomes effective shall, within ten (10) days after the 30th day following the effective date of this Agreement or date of hire either:

1. Become a member of the Union and remain a member.

2. Pay the Union a service fee. The amount of this service fee shall be equal to that paid by regular Union members to include regular and usual initiation fees. The service fee will not include any assessments, special or otherwise. Such payments shall commence on the 30th day after the date of hire.

   a) Employees who are members of, and adhere to the established and traditional tenets of a bona-fide religion, body, or sect, which has historically held conscientious objections to joining or financially supporting labor organizations, shall, instead of the above, be allowed to make payments in amounts equal to the agency fee required above, to a tax-exempt organization (under Section 501(c)(3) of the IRS Code). The Union shall have the right to charge any Employee exercising this option, the reasonable cost of using the arbitration procedure of this Agreement on the Employee's individual behalf. Further, any Employee who exercises this option shall twice a year submit to the Union proof that the charitable contributions have been made.

C. The obligations set forth in this Article shall only be effective to the extent permitted by controlling law, including, but not limited to, any Executive Orders permitting or restricting Union security rights. If there is a legal challenge to any provision of this

348 0

Article, the Employer may suspend its obligations under this Article for the duration of the dispute after conferring on the matter with the Union.

D. The Union, including its International, agrees to save and hold the Employer harmless from any and all claims on account of any matter relating to the terms of this Article, including, but not limited to, any claims by any Employee(s) and compliance with the law.

## SECTION 1.7 DUES CHECKOFF

A. The Company agrees to deduct dues as designated by the Union on a monthly basis from the paycheck of each member of the Union. These deductions will be made only upon written authorization from the Employee on a form provided by the Union. It is understood that such deductions will be made only so long as the Company may legally do so. The Company will be advised in writing, by the Union, as to the dollar amount of the Union membership dues.

B. The Company will remit all such deductions to the Financial Secretary/Treasurer within five (5) business days from the date that the deduction was made, via direct deposit, if possible. All costs related to direct deposit will be borne by the Union. The Union agrees to furnish the Company with the current routing number for direct deposit. The Company shall furnish the Financial Secretary/Treasurer with a deduction list, setting forth the name, address, date of hire and amount of dues, within seven (7) business days of each remittance. The Union agrees to hold the Company harmless from any action or actions growing out of these deductions initiated by an Employee against the Company, and assumes full responsibility of the dispositions of the funds so deducted, once they are paid over to the Union. Errors made by the Company in the deduction or remittance of monies shall not be considered by the Union as a violation of this provision, providing such errors are unintentional and corrected when brought to the Company's attention.

## SECTION 1.8 INTENT OF PARTIES

The Union and the Company agree to work sincerely and wholeheartedly to the end that the provisions of this Agreement will be applied and interpreted fairly, conscientiously, and in the best interest of efficient security operations. The Union and the Company agree to use their best efforts to cause the Bargaining Unit Employees, individually and collectively, to perform and render loyal and efficient work and services on behalf of the Company. Neither the Company, nor the Union, nor their representatives, nor their members will intimidate, coerce, or discriminate in any manner against any person in its employ by reason of his/her membership and activity or non-membership or non-activity in the Union.

It is expressly understood and agreed the services to be performed by the Employees covered by this Agreement pertain to and essential to the operation of the INS Detention Center Service Processing Center. Both the Company and the Union recognize their paramount goal is to maintain safety of the operations of the INS Detention Center.

5

349 D

## SECTION 1.9  ANTI-DISCRIMINATION

Neither the Company nor the Union will discriminate against any Employee because of race, color, religion, sex, age, national origin, Vietnam Era Veterans status, disability or other protected reason.  The Employer will treat Employees with dignity and respect at all times. Employees will also treat each other as well as the employer with dignity and respect.  The Company and the Union recognize that the objective of providing equal employment opportunities for all people is consistent with Company and Union philosophy, and the parties agree to work sincerely and wholeheartedly toward the accomplishment of this objective.

## ARTICLE 2

## SENIORITY

## SECTION 2.1  SENIORITY DEFINED

A. Union seniority shall be the length of continuous service from the Employee's last date of hire as CO for the Employer, past or present and/or any predecessor Employer. Seniority shall not accrue until the Employee has successfully completed the probationary period. Seniority shall be applicable in determining the order of layoff and recall, shift bidding, vacation schedules, extra work, transfers, and other matters as provided for in this Agreement.

B. For the purposes of shift bidding, vacation schedules, transfers, days off and extra work, union seniority shall be defined as seniority within the work site.

C. Any Employee permanently transferred out of the designated Local Bargaining Unit for any reason shall lose their Union seniority as it applies to the order of layoff and recall, shift bidding, vacation schedules, extra work, and other matters as provided for in this Agreement.

D. Part-time Employees will have seniority only among other part-time Employees.  Any part-time Employee who becomes full-time Employee will be placed on the seniority list for full-time Employees in accordance with the date they become a full-time Employee or once they have completed the equivalent of the ninety (90) day probationary period.

E. Employees who make Company approved transfers will maintain Company security based on original hire date after the approved tranfer.

## SECTION 2.2  SENIORITY LISTS

The Company will provide a list to the Local twice a year on demand of the Union.   The data will include name, location, classification, rate of pay, and last Entry on Duty date.   The Union

3500

will verify seniority and provide a copy of the confirmed seniority list to the Company within 14 days of receipt

## SECTION 2.3  PERSONAL DATA

Employees shall notify the Employer in writing, on the company provided form, of their proper mailing address and telephone number or of any change of name, address, or telephone number. The Company shall be entitled to rely upon the last known address in the Employer's official records.

## SECTION 2.4 TRANSFER OUT OF UNIT

Any Bargaining Unit Employee who is permanently promoted to a non-bargaining unit position for more than four (4) weeks shall have their Union seniority frozen. If they return to the bargaining unit at a later date their seniority will start again on that return date.  Anyone performing in a non-bargaining unit position intermittently (for more than on consecutive shift) will have their seniority adjusted by the amount of time spent out of the unit.

## SECTION 2.5 PROBATIONARY EMPLOYEES

Probationary Employees will be considered probationary for a ninety (90) calendar day period after their hire date. The Union will still represent Probationary Employees for problems concerning wages, hours and working conditions, but the Company reserves the right to decide questions relating to transfers, suspensions, discipline, layoffs, or discharge of Probationary Employees without recourse to the grievance procedure contained in this Agreement.

Probationary Employees do not have seniority until the completion of the probationary period, at which time seniority dates back to the date of hire. The Probationary period can be extended by mutual agreement between the Company and the Union.

## SECTION 2.6 TERMINATION OF SENIORITY

The seniority of an Employee shall be terminated for any of the following reasons:
A. the Employee quits or retires;
B. the Employee is discharged;
C. a settlement with the Employee has been made for total disability, or for any other reason if the settlement waives further employment rights with the Employer;
D. the Employee is laid off for a continuous period of one year or 365 calendar days;
E. the U.S. Government revokes the Employee's clearances;
F. the Employee is permanently transferred out of the bargaining unit.

351 0

# ARTICLE 3

## JOB OPPORTUNITIES

### SECTION 3.1 FILLING VACANCIES

If a vacancy occurs in a regular position covered by this Agreement, and the Employer chooses to fill that vacancy, the job will be posted for a period of five (5) working days (excluding Saturdays, Sundays and holidays). The Project Manager or designee will notify the Union President in writing of such openings. The Union President will then verify that all part time position CO's have been notified. When a vacancy occurs, the Employer will fill the position with the most senior Employee who has applied for the position in writing, who has been trained (if required) to fill any necessary special qualifications for the new position.

### SECTION 3.2 LAYOFF AND RECALL

In the event of layoff or recall, when positions are being reduced, probationary Employees will be laid off first. Should it be necessary to further reduce the work force, Employees will be retained on the basis of seniority. Recall of Employees will be accomplished by recalling the last laid off Employee first, and so on.

### SECTION 3.3 APPOINTMENT OF SUPERVISORY STAFF

The U.S. Government in its contract with the Company creates specific guidelines for the job duties and qualifications of Supervisors. Based on these guidelines, all appointments will be made on the basis of suitability as evaluated by the Company. Suitability shall include an Employee's skills, experience, past performance, capabilities, and the needs of the operation. If, in the Employer's determination, Employees are equally qualified, seniority will prevail.

# ARTICLE 4

## MANAGEMENT'S RETAINED RIGHTS

### SECTION 4.1

Management of the business and direction of the security force are exclusively the right of management. These rights include the right to:

1. Hire;
2. Assign work and schedule;
3. Promote, Demote;
4. Discharge, discipline, or suspend based on Article 6;
5. Determine the size of the workforce, including the number, if any, of employees assigned to any particular shift.

8

352 D

6. Make and enforce work rules not inconsistent with the provisions of this agreement;
7. Require Employees to observe reasonable Employer rules and regulations;
8. Determine when overtime shall be worked;
9. Determine the qualifications of an Employee to perform work.

## SECTION 4.2

Any of the rights, power or authority the Company had prior to the signing of this Agreement are retained by the Company, except those specifically abridged or modified by this Agreement and any supplemental Agreements that may hereafter be made. The Company's failure to exercise any function reserved to it shall not be deemed a waiver of any such rights.

## ARTICLE 5

## GRIEVANCE PROCEDURE

## SECTION 5.1 INTENT

For purposes of this Agreement, a grievance shall mean a claimed violation, misinterpretation, or misapplication of any provision of this Agreement, or the challenge of any disciplinary action taken against a Union Employee, except that this grievance procedure shall not be used for any suspension or revocation of required DO clearances by the U.S. Government. In addition, the grievance procedures outlined herein shall not apply to any non-disciplinary situation where the company is acting under express directives of the U.S. Government.

## SECTION 5.2 GENERAL PROVISIONS

A. The number of days outlined in Section 5.3 in the processing and presentation of grievances shall establish the maximum time allowed for the presentation and processing of a grievance. The term "days" shall not include Saturdays, Sundays or holidays when used in this Article.

B. Should either the Company, the Union, or the aggrieved employee fail to comply with the time limits as set forth in this Article, the party who failed to comply with the time limits shall forfeit the grievance.

C. Time limits set forth herein may be extended only by mutual agreement of the Union and Company.

## SECTION 5.3 GRIEVANCE PROCEDURE

All grievances shall be presented and processed in accordance with the following procedures:

A. Informal Step - The parties shall make their best efforts to resolve any dispute on an informal basis. Both the Company and the Union agree that the Employee will first discuss the complaint with their immediate supervisor (not in the bargaining unit), within five (5) working days of the incident being grieved, to start the informal

353 D

procedure. If the informal procedure is not invoked within five working days of Employee's knowledge of a grievable issue, then it is agreed by both parties that no further action can be taken. If the complaint is not satisfactorily adjusted within three (3) working days of the inception of the informal discussion, it may be submitted in writing to the Project Manager or designee in accordance with Step One.

B. **Step One** - If the matter is not resolved informally, the Employee shall, not later than ten (10) days after the informal discussion with the immediate supervisor, set forth the facts in writing, specifying the Article and paragraph allegedly violated. This shall be signed by the aggrieved Employee and the union representative, and shall be submitted to the Project Manager or designee with a copy to the Company's HR Director. The Project Manager or designee shall have ten (10) days from the date the grievance was received by the Project Manager or designee to return a decision in writing with a copy to the aggrieved Employee and the union representative.

C. **Step Two** - If the grievance is not settled in Step One, the grievance may be appealed in writing to the Company's Director of Human Resources or designee not later than ten (10) days from the denial by the Project Manager or designee. The Director of Human Resources or designee will have twenty (20) days from the date the grievance was received to return a decision, in writing, with a copy to the aggrieved Employee and the union representative.

D. **Grievance for Discipline** - Any grievance involving discharge or other discipline may be commenced at Step One of this procedure. The written grievance shall be presented to the Project Manager through the Site Supervisor or designee within ten (10) days after the occurrence of the facts giving rise to the Grievance.

## SECTION 5.4 ARBITRATION PROCEDURE

Grievances processed in accordance with the requirements of Section 5.3 that remain unsettled may be processed to arbitration by the Union, giving the Company's Director of Human Resources written notice of its desire to proceed to arbitration not later than fifteen (15) days after rejection of the grievance in Step Two. Grievances which have been processed in accordance with the requirements of Section 5.3 which remain unsettled shall be processed in accordance with the following procedures and limitations:

A. **Selection of an Arbitrator** - Within fifteen (15) days of receipt of the Union's written notice to proceed with arbitration, the Company and the Union will meet telephonically to jointly attempt to agree upon the selection of a neutral arbitrator. If, within fifteen (15) days, the parties fail to agree upon the selection of an arbitrator, the Union will request the Federal Meditation and Conciliation Service (FMCS) to supply a list of seven (7) arbitrators. An arbitrator will be selected from the list supplied by the FMCS by parties alternately striking from the list until one (1) name remains, and this individual shall be the arbitrator to hear the grievance.

CBA (Akal & SPFPA Local 165   2003 – 2006)

354 D

**B. Decision of the Arbitrator** - The arbitrator shall commence the hearing at the earliest possible date. The decision of the arbitrator shall be final and binding upon the parties to the Agreement. Any decision shall be complied with, without undue delay after the decision is rendered. It is understood and agreed between the parties that the arbitrator shall have no power to add to, subtract from, or modify any of the terms of this Agreement.

**C. Arbitration Expense** - The arbitrator's fees and expenses, including the cost of any hearing room, shall be shared equally between the Company and the Union. Each party to the arbitration will be responsible for its own expenses and compensation incurred bringing any of its witnesses or other participants to the arbitration. Any other expenses, including transcript costs, shall be borne by the party incurring such expenses.

## SECTION 5.5 CLASS ACTION

The Union shall have the right to file a group grievance (class action) or grievances involving more than one (1) Employee at the Informal Step of the grievance procedure.

## SECTION 5.6 INDIVIDUAL GRIEVANCES

No individual may move a grievance to arbitration.

## ARTICLE 6

## DISCIPLINE

## SECTION 6.1 GROUNDS FOR DISCIPLINE AND DISMISSAL

After completion of the probationary period, as specified in Section 2.5, no Employee shall be disciplined, dismissed or suspended without just cause. Just cause shall include any suspension or revocation of clearance by ICE. The "final decision" on the employee's removal shall be determined by the Government, and the Employer shall be held harmless by the Union and the employee for any further claims made after this final determination. This provision is not intended to limit or prohibit the rights of any party to seek relief from other parties.

The Company's contract with the U.S. Government sets out performance standards and contract requirements for the CO's and all employees are required to comply with these standards. Failure to do so may lead to disciplinary action. Employees agree to comply with any non-disciplinary directive issued by the US Government.

The Company may discipline Employees when necessary and discharge those who fail to uphold U.S. Government or Company standards as described above. It is recognized by parties to this Agreement that progressive discipline generally shall be applied in dealing with Employees. However, it is also recognized that offenses may occur for which progressive discipline is not

11

355 D

applicable (e.g. fraud, gross misconduct, theft, etc.). Disciplinary measures vary depending on the seriousness of the matter and the past record of the Employee. Failure to comply with any investigation procedures will result in discipline up to and including termination.

## ARTICLE 7

## HOURS OF WORK AND OVERTIME

### SECTION 7.1  WORKDAY AND WORKWEEK

For the purposes of this Article, a regular workweek of forty (40) hours of work shall constitute a normal full-time workweek for full-time Employees. Shifts shall be scheduled at the discretion of the Employer to fulfill the needs of the U.S. Government. Nothing contained herein shall guarantee to any Employee any number of hours of work per day or week.

### SECTION 7.2  OVERTIME

An overtime rate of time and one-half (1 1/2) of an Employee's base rate of pay (exclusive of health and welfare and other fringe additions to pay) shall be paid for all hours actually worked in excess of forty (40) hours in a work week.

### SECTION 7.3  OVERTIME REQUIREMENT

If directed to work overtime (i.e. over forty [40] hours in a workweek) or extra hours, and the seniority system is not invoked due to shortness of notice to the Company, the Employee shall be required to do the work, unless the Employee is excused by the Company for good cause.

### SECTION 7.4  OVERTIME DISTRIBUTION

Bargaining Unit employees will be expected to work overtime assignments.  A list of volunteers shall be compiled by seniority for each shift.   When the senior volunteer works overtime his name will go to the bottom of the list.

When a employee is next on the list, and cannot work because of personal reasons, he/she will be passed over and the next Bargaining unit employee on the list will work overtime and the employee who turned down the over time will be next in turn for overtime.

Mandatory overtime will be inverse to voluntary, in that the employee with the least seniority will be required to meet the overtime requirement.   This includes involuntary call-in which results in overtime.

12

356 D

# ARTICLE 8

## WORK SHIFTS AND PAYMENT POLICIES

### SECTION 8.1 SHIFT BIDDING, HOURS OF WORK, & SENIORITY

Upon ratification of this agreement, the Company and the Union agree to meet within 60 days to design a mutually acceptable method for shift bidding and days off.

### SECTION 8.2 WAGE SCHEDULE

The base rate of pay for Custody Officers covered by this agreement in all locations are described in below:

**Current**

| | |
|---|---|
| Custody Officer | 18.05 per hour |
| Health and Welfare allowance | 3.05 per regular hr worked |
| Pension | 1.22 per regular hr worked |
| Uniform Allowance | 0.42 per regular hr worked |

**as of January 1, 2004**

| | |
|---|---|
| Custody Officer | 22.34 per hour |
| Health and Welfare allowance | 3.05 per regular hr worked |
| Pension | 1.22 per regular hr worked |
| Uniform Allowance | 0.42 per regular hr worked |

**as of January 1, 2005**

| | |
|---|---|
| Custody Officer | 23.00 per hour worked |
| Health and Welfare allowance | ** per regular hr worked |
| Pension | 1.22 per regular hr worked |
| Uniform Allowance | 0.42 per regular hr worked |

**as of January 1, 2006**

| | |
|---|---|
| Custody Officer | 23.70 per hour |
| Health and Welfare allowance | ** per regular hr worked |
| Pension | 1.22 per regular hr worked |
| Uniform Allowance | 0.42 per regular hr worked |

** The parties agree that either party may reopen negotiations for amendments to Health & Welfare Allowance at any time after September 1 and before October 1, for all years governed by this contract, by giving written notice to the other party. Any final agreement resulting from said negotiation shall be incorporated into the terms of this agreement. If the parties fail to reach

13

357 D

agreement, the dispute shall be submitted to arbitration in accordance with Article 5 of this agreement. All provisions of this Agreement, including, but not limited to, Article 16, shall remain in force during the terms of the negotiations and any resulting arbitration, and for the remainder of the terms of this agreement.

## SECTION 8.3 PAYDAY

Payday for all hourly Employees will be no later than 11 a.m. on Friday following the two (2) week pay period ending on Saturday, subject to change by mutual agreement. Should direct deposit become available, the company will make this option available to all employees.

## SECTION 8.4 UNDISPUTED ERROR

In case of an undisputed error on the part of the company as to an Employee's rate of pay, proper adjustment will be made in the next paycheck after the error has been brought in written form to the Company's attention. Any error, involving eight (8) hours of pay or more, will be corrected and paid within three (3) working days.

## SECTION 8.5 SHIFT DIFFERENTIAL

Employees working between the hours of 1500 and 2300 or any part there of will be paid a shift differential of 4%. Those employees working between the hours of 2300 and 0700 or any part there of will be paid a shift differential of 6%.

## ARTICLE 9

## HOLIDAYS

## SECTION 9.1 HOLIDAYS DEFINED

Whenever the term "holiday" is used, it shall mean:

| | |
|---|---|
| New Years Day | Independence Day |
| Veterans Day | Columbus Day |
| Christmas Day | Labor Day |
| Thanksgiving Day | Martin Luther King Birthday |
| Memorial Day | Presidents Day |
| Birthday | Good Friday |

## SECTION 9.2 MISCELLANEOUS HOLIDAY PROVISIONS

A. A full-time position Employee who is not required to work on a holiday shall be paid eight (8) hours straight time, exclusive of any shift premium for that holiday.

B. Any full-time position Employee who works as scheduled on a holiday shall receive the Employee's appropriate rate of pay times 1 and half for all hours worked, and in addition, shall receive eight (8) hrs holiday pay at the regular rate as described in (A) above.

CBA (Akal & SPFPA Local 165   2003 – 2006)

14

3580

C. Any part time position Employee who works as scheduled on a holiday shall receive the Employee's appropriate rate of pay times for all hours worked, and in addition shall receive prorated holiday pay based on the number of actual hours the Employee worked in the two (2) week pay period prior to the holiday.

D. In the event that the Holiday falls on a weekend, the term "holiday" will refer to the day that the U.S. Government designates as the Holiday.

E. Any employee who is requested and agrees to work on any of the above named holidays but fails to report to work for such holiday shall not receive holiday pay, and shall be subject to discipline. Employees must work the scheduled day before and the scheduled day after to receive holiday pay.

## ARTICLE 10

## VACATIONS

### SECTION 10.1  ELIGIBLE FULL-TIME EMPLOYEES

Eligibility for vacation benefits shall be based on Department of Labor (DOL) rules under Service Contract Act. Eligible full-time Employees shall be entitled to annual vacation based on their continuous years of service with the Employer (based on the Employee's anniversary date of employment) at their individual hourly rate of pay at the time payment is made in accordance with the following schedule:

> Upon completion of one (1) year of service:  eighty (80) hours
> Upon completion of five (5) years of service: one-hundred and twenty (120) hours
> Upon completion of ten (10) years of service: one-hundred and sixty (160) hours
> Upon completion of fifteen (15) years of service: two-hundred (200) hours

### SECTION 10.2  ELIGIBLE PART TIME POSITION EMPLOYEES

Part-time Employees are eligible for vacation benefits on a prorated basis, based on 2080 hours and defined by the maximums allowed in the contract.  All paid hours during the preceding year will used to figure the employee's work hours.

### SECTION 10.3  SCHEDULING VACATIONS

Vacations, insofar as is reasonably possible, shall be granted at the times most desired by the Employee, after the Employee's anniversary date. Employees who cash out vacation time are not entitled to participate in the vacation selection process, nor take vacation during the year unless approved under the guidelines for LWOP as outlined in Article 11.

15

359 D

Employee will pick vacation by full time seniority with thirty (30) days to pick between November 1 and November 30 of each year. The Employee shall be ready to pick when asked. If not ready, the employee will be passed over and pick what is available when ready. Once the employee has picked his/her vacation by seniority the company will post a list of vacation schedules no later than January 01 of each year. Once posted, management cannot make any changes except as needed to maintain continuity of operations of the SPC. Employees will submit a written request based on available opening. This process is limited to vacation selections of 1 week increments.

All other vacation requests must be made in writing not less than 2 week prior to the proposed vacation dates. The Company will respond to these other requests with in 5 working days.

## SECTION 10.4 UNUSED VACATION

Vacations shall not be cumulative from one year to the next. Any earned but unused vacation time remaining at the end of a year of service (based on Employee's anniversary date of employment) shall be paid to the Employee.

## SECTION 10.5 PAY IN LIEU OF VACATION LEAVE

At any time during the year, Employees may request in writing to be paid for earned vacation, pay in lieu of taking actual vacation leave. Earned vacation pay will be paid in the next pay cycle.

## SECTION 10.6 TERMINATING EMPLOYEES

Upon termination of employment, Employees will be paid at their individual hourly rate vacation time earned as of their last anniversary date, but not used, as entitled by the Service Contract Act. (Example: An Employee who terminates one month into the next anniversary year is entitled to any of the previous year's earned accrued vacation not already used, and not to the additional month accrued in the new anniversary period).

## SECTION 10.7 VACATION - LAID OFF EMPLOYEES

Length of service with the Employer shall accrue for the purposes of vacation benefits while an Employee is on laid-off status for up to one (1) year. Employees will only be paid vacation benefits upon returning to work.

## SECTION 10.8 VACATION INCREMENTS

Consistent with Employer approval, efficiency, and economy of operations, Employees with two (2) or more weeks of vacation may take their vacation in segments of less than one (1) week each. Vacation must be taken in one (1) day (8 hour) increments

360 0

# ARTICLE 11

## LEAVES OF ABSENCE

### SECTION 11.1 LIMITATIONS

Personal leaves of absence for non-medical emergencies may be granted at the sole discretion of the Employer without loss of seniority to the Employee. Such leaves, if granted, are not to exceed 30 days, unless a special extension is approved by the Employer. An employee on any unpaid leave of absence will be required to use available vacation or personal leave time in full before beginning the unpaid leave. Length of service with the Employer shall not accrue for purposes of vacation, holiday, or other accrued benefits for any unpaid leave of absence over thirty (30) days. The Employer will make every reasonable effort to maintain an Employee's position while on a non-statutory unpaid leave of absence. Unpaid leaves of absence may be taken only with written approval of the Employer or in a case of verified personal emergency. Failure to report for scheduled shifts without Employer permission may face disciplinary action.

Any full-time employee who uses more than two (2) days of leave without pay (LWOP) per Government contract year for absences not covered by Family and Medical Leave Act of 1993 (FMLA), Worker's Compensation, or whose absence is not a company approved accommodation and/or leave, may face disciplinary action.

### SECTION 11.2 MEDICAL LEAVE

    A. The Family and Medical Leave Act of 1993 (FMLA) is incorporated herein.

    B. The Company agrees to honor the FMLA for all eligible Employees.

    C. During medical leave, the Employee shall be required to furnish a report from the doctor when requested periodically by the Employer. Upon the expiration of said leave, the Employee shall furnish the Employer with a statement, signed by the doctor, which establishes the fitness of the Employee to return to the Employee's previously held work. Any Employee who is not able to return to work with a medical clearance from a licensed physician at the end of a maximum medical leave shall be terminated from Employment.

    D. If the Employee files for medical leave on false pretext or works for another employer without pre-authorization from the company, the Employee will be removed from the CO program and from employment with Employer.

### SECTION 11.3 MILITARY LEAVE

An Employee of the Company who is activated or drafted into any branch of the armed forces of the United States under the provisions of the Selective Service Act or the Reserve Forces Act shall be granted an unpaid military leave of absence, as required under the federal law, for the

361 D

time spent in full-time active duty. The period of such leave shall be determined in accordance with applicable federal laws in effect at the time of such leave.

## SECTION 11.4 UNION LEAVE

The Company agrees to grant 5 days at one time of Union Leave (LWOP) to Union Officers (Maximum 5 employees with no more than 3 per shift), as long as staffing permits, upon 14 days written request for the purpose of attending Union Conventions, or other meetings of vital interest to the Union, for the duration required to perform the duties of the position, which he or she was elected or appointed and with 7 days notice for a local meetings of 1 day or less or 14 days notice for more than 1 day of leave.

## SECTION 11.5 PERSONAL/SICK LEAVE

Each Employee shall be entitled to nine (9) days of sick leave per full contract year, all days made available on their anniversary date. Of the nine (9) sick day entitlement, six (6) days shall be available for cash out at the end of the Employees anniversary year.  Any unused portion of these six (6) personal days will be cashed out with in 30 days of the anniversary date.  The additional three (3) days of the nine (9) days may be taken after the six (6) days have been used and any unused portion of these three (3) sick days shall not be cashed out at the end of the contract year and cannot be carried over.

    A. Sick days shall be used in no less than eight-hour increments and shall be paid when taken by the Employee.

    B. Upon termination of employment, Employee will be paid at their individual hourly rate for any unused, earned personal leave, based upon the number of actual hours Employee worked during that year based on hire date anniversary.   If the Employee has used more personal days upon termination than he/she earned based upon time worked on the contract, the amount of the overage will be deducted from the Employee's final paycheck.

    C. Sick leave (and vacation) days may be used to cover absences caused by illness. Any Employee who is unable to report to work because of sickness must notify the Employer at least four (4) hours prior to the beginning of his/her regular shift in order to be eligible for paid sick leave benefits. Proof of illness may be required after two (2) days. Disciplinary action may result from excessive, unapproved absenteeism.

## SECTION 11.6 PROCESSING UNPAID LEAVES OF ABSENCE

The Employer will consider requests for unpaid leaves of absence and may grant them at its sole discretion. An unpaid leave of absence must be processed in the following manner:

    A. All requests for unpaid leaves of absence shall be submitted in writing to Project Manager or designee at least ten (10) calendar days prior to the date the leave will take effect, except in cases of verified personal emergencies, and include:

3620

    1. The reasons for such leave;
    2. The effective dates of such leave;
    3. The estimated date of return to work.

**B.** The Company will respond to the request within seven (7) working days.

**C.** The written request for leave of absence shall be submitted to the Project Manager for final approval. If the request for the leave of absence is approved by the Project Manager, a copy of the approved leave of absence will be given to the Employee involved.

**D.** Extensions of the leave of absence may be granted at the sole discretion of the Employer, upon written request by the Employee within ten (10) calendar days prior to the expiration of the leave of absence. Extensions, when granted, shall not total more than thirty (30) days.

## SECTION 11.7 GENERAL PROVISIONS

Seniority shall accumulate during the period of any approved leave of absence subject to the provisions of this Agreement.

## SECTION 11.8 JURY DUTY

Full time employees on the payroll with one or more years of continuous service will be reimbursed up to five (5) days in any calendar year for any loss of income during their otherwise scheduled workweek for time spent on Jury Duty.

Said reimbursement shall be offset by any jury fees received by the employee. Employees must inform their supervisor immediately upon receiving a notice to report for jury duty. The Employee reserves the right to request an exemption when the Employer determines that the employee's absence would create hardship.

## SECTION 11.9 BEREAVEMENT LEAVE

If necessary for an employee to lose time from work because of a death in the immediate family the employee shall be entitled to 5 days paid leave. If the funeral takes place more than 250 miles from the site the employee shall be entitled to 7 days leave.

Immediate family is defined to mean an employee's father, mother, spouse, sister, brother, child (including legally adopted children and/or step children), father in law, mother in law, sister in law, brother in law, grandparents and grand children.

The employer reserves the right to verify all bereavement leave requests and may require proof of the death for which the employee requests leave.

## SECTION 11.10 ABSENTEEISM FROM DUTY

363 D

2 hours

When an employee fails to report for duty or to call the appropriate supervisor four (4) hours prior to the start of the scheduled shift, it is considered a "no call/no show". In the event an emergency prevents an employee from reporting to work and notifying the office prior to the scheduled shift, an employee must contact the appropriate supervisor as soon as possible and explain the failure to report for duty. Explanations are subject to verification. Unverified and unexcused absences from duty will result in disciplinary action.

Akal Security, Inc., considers that an employee has resigned their position voluntarily (voluntary separation) if the employee is absent from duty due to "no call/no show" more that 3 shifts or 2 consecutive days in a 12 month period.

## ARTICLE 12

## HEALTH, WELFARE AND UNIFORM ALLOWANCES

### SECTION 12.1 PAYMENTS

For the life of this Agreement, the Employer will make health and welfare payments to Full Time Employees on all hours up to forty (40) hours per week, and up to a total of 2080 hours per contract year, as described in Appendix A. All Health and Welfare funds will be forwarded to the Union. With these funds, the Union shall provide a full health insurance plan with no deductible or co-payment and a standard Dental plan for each full time regular employee and their legal dependents at no additional charge. The Company will retains the right to approve any health insurance and/or dental plan. The Company upon demand may audit any such plan, not more than 4 times a year.

All full time employee's and their dependants will join this plan after ninety (90) days of employment.                                                                            JICK.

Any part time employee who on average worked more than 32 hours in the 90 day period based on the employees anniversary date shall be entitled to insurance coverage. Subject to review every quarter based anniversary.

Employees who take leave with out pay will be required to make monthly payments to continue their coverages.

### SECTION 12.2 OTHER BENEFITS

The Employer will offer Employees the opportunity to participate in other available Employee paid fringe benefit programs made available to all Officers employed by the Company. These programs may include cafeteria plans, payroll deduction plans, retirement plans, insurance plans, 401(k) plans, and any other plan mentioned in this Agreement.

### SECTION 12.3 UNIFORM MAINTENANCE

364  D

The Employer will pay the Employee an allowance for each hour worked, up to 40 hours per week, for uniform maintenance as described in Appendix A.

# ARTICLE 13

## MISCELLANEOUS PROVISIONS

### SECTION 13.1 BULLETIN BOARDS

The Employer will make its best effort to obtain a space from the U.S. Government for Union to locate a Union-provided bulletin board that will be used by the Union for posting of notices of meetings, elections, appointments, recreational and social affairs, and other Union notices. The provision of these facilities is the prerogative of the U.S. Government, who owns and controls all worksite facilities.

### SECTION 13.2 PHYSICAL EXAMINATION

The Employer has the right to choose the physician who will perform any physical exam that may be required.

Medical exams may be required by the U.S. Government contract, or should the Employer have concerns regarding an Employee's fitness for duty. The Employer may designate the physician or clinic, at its discretion. Physical fitness is an important job requirement. Employees must pass the medical exam prescribed by the Employer's contract with the U.S. Government in order to be employed and to maintain employment.

The Employer will pay for the time required for the employee to take required physical exams. Time for any exams requiring more than two (2) hours must be pre-approved by the Site Supervisor. If, when the appointment is going to exceed two (2) hours, the Employee will call into Project Manager or designee to inform them of the delay and request approval for additional time.

### SECTION 13.3 DRUG AND ALCOHOL PROGRAM

The parties recognize that, given the safety and sensitivity of the environment, and the nature of the work performed by the Company and its employees, the use of controlled substances or alcohol on the job poses a substantial risk to the all Employees, the detainees, the Company and members of the public. To prevent or limit such risk, and pursuant to the Company's policy to maintain a drug-free workplace random Drug and Alcohol screening will occur. Such policy shall be subject to revision by the Company by mutual agreement with the union. The Company will pay for any time used by an employee taking an initial drug test that finds a negative result.

### SECTION 13.4 UNION MEETINGS

365 D

Neither Union officials nor Union members shall, during working time (excluding break and lunch periods), solicit membership, receive applications, hold meetings of any kind for the transaction of Union business, or conduct any Union activity other than the handling of grievances as described in this Agreement. No Employee may leave their post without permission from the Employer under any circumstances, unless there is appropriate Government permission granted. No Employee may be at the worksite at any time unless engaged in company approved activities

## SECTION 13.5  MANAGEMENT/LABOR RELATIONS

In the interest of good communications the Company and the Union agree there shall be a Labor and Management Meeting consisting of three (3) representatives of the Union and upto three representatives from the Company.  Both parties will mutually agree upon any additional participants.  The purpose of this meeting will be improve labor/management relations by providing an informal forum for the free exhange of views and discussion of mutual concerns of both parties.  It is clearly not the intention that this exchange by-pass the normal grievance procedure.  Any agreements reached at these meetings to change practices or policies shall be put in writing and will only be effective when signed by both parties.

It is suggested that these meetings will be held monthly.  All scheduled meeting times and places will be mutually agreed to by both parties.

## SECTION 13.6 ACCESS TO PERSONNEL FILES

As possible, and in accordance with applicable laws, the Union shall have access to personnel records of an employee in conjunction with the investigation of a grievance or for use in arbitration.  The union will present written authorization from the employee before access will be granted.  The Union shall maintain the confidentially it of all information contained therein.

## SECTION 13.7  GUARD CARDS AND PERMITS

All employees shall submit to the Company within fifteen (15) calendar days of the execution of this agreement a copy of the California guard card.  All employees shall be required, at their own expense,, to maintain a valid California Guard card.  In the event that employee's California Department Consumer Affairs Guard Card Permit lapse or becomes otherwise invalidated, the Employer may temporally suspend but not discharge the employee.  Once having proof that the payment renewal was sent within ninety (90) days guideline set forth by the Department of Consumer Affairs, the employee may continue employment as long as the employee has shown proper documentation that their guard card is valid.

## SECTION 13.7  TRAINING

The Company agrees to pay employees for required and mandated government training to the extent required by the contract between the INS and the Company.

366 D

# ARTICLE 14

## 401(k) PLAN

The Company shall provide a 401(k) plan to which Officers are eligible to contribute, whether Union or Non-Union. Employees shall be subject to the eligibility requirements and rules of the Plan.   All Pension moneys shall be paid directly into the 401K plan.

# ARTICLE 15

## SAFETY

### SECTION 15.1  SAFETY POLICY

It is the policy of the Company to make its best efforts to provide Employees with places and conditions of employment that are free from or protected against occupational safety and health hazards. Under this Agreement, all worksites and facilities are the property of the U.S. Government, who is responsible for the condition and safety of the worksite.

While there is a safety committee in place at the site, the Union will continue to select the representative for the committee.

### SECTION 15.2 OSHA STANDARDS

The Company will report any safety violations observed or reported to the Company in any U.S. Government-provided workstation or break room.

# ARTICLE 16

## CONTINUITY OF OPERATIONS

### SECTION 16.1 NO STRIKES

A.  Both the Company and the Union agree that continuity of operations is of utmost importance to the Company's security operations.   Therefore, so long as this Agreement is in effect, the Union and the Company agree that there will be no strikes, lockouts, work stoppages, illegal picket lines, slowdowns, or secondary boycotts during the term of this Agreement.

B.  Upon hearing of an unauthorized strike, slowdown, stoppage of work, planned inefficiency, or any curtailment of work or restriction or interference with the operation of the Employer, the Union shall take affirmative action to avert or bring such or bring such activity to prompt termination.

### SECTION 16.2 LOCKOUTS

367 D

During the life of this Agreement, the Employer shall not lockout any Employees covered in this Agreement.

## ARTICLE 17

## SEPARABILITY OF CONTRACT

In the event that any provision of this Agreement shall at any time be declared invalid by any court of competent jurisdiction or through U.S. Government regulations or decree, such parties hereto agree to renegotiate such provision or provisions of this Agreement for the purpose of making them conform to the decree or U.S. Government statutes, so long as they shall remain legally effective. It is the express intention of the parties hereto that all other provisions not declared invalid shall remain in full force and effect.

## ARTICLE 18

## ENTIRE AGREEMENT

The parties acknowledge that during negotiations that resulted in this agreement, each had the unlimited right and opportunity to make demands and proposals with respect to all proper subjects of collective bargaining; that all such subjects were discussed and negotiated upon; and that the agreements contained herein were arrived at after free exercise of such rights and opportunities.  Therefore, the Company and the Union shall not be obligated to bargain collectively on any matter pertaining to conditions of employment, including but not limited to, rates of pay, wages, hours of work, disciplinary actions, training requirements, etc., during the term of this Agreement, except as specifically provided for in other provisions of this Agreement.

## ARTICLE 19

## DURATION

This Agreement shall be effective from 12;00 noon,  October 31, 2003 through  December 30, 2006  and supersedes any and all prior agreements or understandings between the parties.

368 0

IN WITNESS WHEREOF, the parties have caused their representatives to sign this Agreement as full acknowledgment of their intention to be bound by the Agreement.

FOR: *SPFPA*

BY: _David Payne_

TITLE: _V.P. Region 7_

DATE: _10-30-03_

FOR: *SPFPA Local #165*

BY: _Giller Echura_

TITLE: _President of Local #165_

DATE: _10-30-03_

FOR: Akal Security, Inc.

BY: _[signature]_

TITLE: _(Director) H.R._

DATE: _10-30-03._

369 D

1  MARKS, GOLIA & FINCH, LLP
2      Jason R. Thornton  (SBN 185637)
       Bernard F. King III  (SBN 232518)
3  3900 Harney Street – First Floor
   San Diego, California 92110-2825
4  Telephone:  (619) 293-7000
   Facsimile:  (619) 293-7362
5
   NICHOLAS & BUTLER, LLP
6      Craig M. Nicholas  (SBN 178444)
       Matthew B. Butler  (SBN 201781)
7  225 Broadway, 19th Floor
   San Diego, California 92101
8  Telephone:  (619) 325-0492
   Facsimile:  (619) 325-0496
9
   Attorneys for Plaintiffs
10

11          SUPERIOR COURT OF THE STATE OF CALIFORNIA

12              IN AND FOR THE COUNTY OF IMPERIAL

13

14  DAVID LOERA, for himself and on behalf    )  CASE NO.:  ECU 03022
15  of others similarly situated and the general )
    public,                                     )  PLAINTIFF DAVID LOERA'S
16                              Plaintiffs,      )  RESPONSES TO SPECIAL
    v.                                          )  INTERROGATORIES (SET ONE)
17                                              )
    AKAL SECURITY, INC., a corporation;         )  Judge: Hon. Christopher W. Yeager
18  And DOES 1-100, inclusive,                  )  Dept: 1
19                              Defendants      )
20  _____  )

21

22  PROPOUNDING PARTY:   Defendant AKAL SECURITY, INC.

23  RESPONDING PARTY:    Plaintiff DAVID LOERA

24  SET NUMBER:          ONE (1)

25      Plaintiff DAVID LOERA hereby responds to the first set of Special Interrogatories
26
27  propounded by Defendant AKAL SECURITY, INC. as follows:

28  ///
                                                          370 D

1    Responding party has not fully completed investigation of the facts relating to this case,

2   has not fully completed discovery in this action, and has not completed preparation for trial. All

3   of the responses contained herein are based solely upon such information and documents as are

4   presently available and specifically known to this responding party.

5    It is anticipated that further discovery, investigation, legal research and analysis will

6   supply additional facts, add meaning to the known facts, as well as establishing entirely new

7   factual conclusions and legal contentions, all of which may lead to substantial additions to,

8   changes in, and variations from the information herein set forth. As discovery proceeds,

9   witnesses, facts and evidence may be discovered which are not set forth herein, but which may

10  have been responsive to an interrogatory. Facts and evidence now known may be imperfectly

11  understood, or the relevance or consequences of such facts and evidence may be imperfectly

12  understood and, accordingly, such facts and evidence may, in good faith, not be included in the

13  following responses. These responses are made without prejudice to the responding party's right

14  to present at trial or use in later discovery such additional evidence as may later be discovered or

15  evaluated.

16   The following responses to interrogatories are made solely for the purpose of this action.

17  Each response is subject to any and all objections as to competency, relevancy, materiality,

18  propriety, and admissibility that may be applicable. In addition, each response is subject to any

19  and all objections and grounds that would require the exclusion of any statement or material

20  provided if the request was being asked of, or any statement or material was being provided by, a

21  witness present and testifying in court. All such objections and grounds are reserved and may be

22  interposed at the time of trial.

23   As noted above, these interrogatories are based upon information presently available to the

24  responding party, and no incidental or implied admissions are intended. The fact that the

25  responding party has responded or objected to any interrogatory, or any part thereof, should not be

26  taken as an admission that the responding party accepts that the request or the response or the

27  objection thereto constitutes admissible evidence. The fact that the responding party has

28  responded to part or all of any request is not intended and shall not be construed to be a waiver by

1  the responding party of all or any part of any objection to any request.

2    The responding party objects generally to these interrogatories to the extent they request

3  information and documents protected by any privilege, including, but not limited to, the attorney-

4  client or work-product privileges.  In particular, and without limiting the generality of these

5  objections, letters, memoranda and other writings transmitted by or between the responding party

6  or its principals or agents and its counsel, or prepared and/or maintained internally by counsel, are

7  not included in these responses.

8    These preliminary statements and general objections are incorporated in their entirety and

9  to each and every response.  Without waiving the foregoing general objections, the responding

10  party will make reasonable efforts to respond to each and every interrogatory, to the extent it has

11  not been objected to, and the responding party understands and interprets the interrogatory.  If the

12  propounding party subsequently asserts an interpretation of any request which differs from that

13  assumed in the response, the responding party reserves the right to amend or supplement its

14  responses.

15  **RESPONSES TO SPECIAL INTERROGATORIES**

16  **SPECIAL INTERROGATORY NO. 1:**

17    State all facts upon which YOU based YOUR contention that during the past four years

18  AKAL failed to provide rest and meal periods or compensation in lieu thereof. (For purposes of

19  these Interrogatories, the terms "YOU" and "YOUR" means Plaintiff David Loera, and other any

20  natural person or any business, legal or governmental entity or association acting or purporting to

21  act on plaintiff's behalf.)

22  **RESPONSE TO SPECIAL INTERROGATORY NO. 1:**

23    This responding party objects to this interrogatory to the extent that it seeks information

24  which is protected by the attorney-client privilege and/or work product doctrine.  In addition, this

25  interrogatory is overbroad, oppressive, burdensome and calls for a legal conclusion.  However,

26  without waiving the foregoing objections, this responding party responds as follows:

27    Akal fails to provide adequate rest and meal periods.  In the absence of such rest and meal

28  periods, Akal fails to provide premium pay.  Akal employees were consistently denied an

---

**N&B**

3

3720

RESPONSES TO SPECIAL INTERROGATORIES PROPOUNDED BY DEFENDANT AKAL SECURITY, INC.

1  uninterrupted meal break of at least thirty minutes for every five hours worked and consistently

2  denied a break of at least ten minutes for every four hours worked.  Instances of such wrongful

3  conduct by Akal include, but are not limited to, limiting meal periods to twenty minutes, requiring

4  meals to be eaten while at security post, requiring employees to answer phones while on purported

5  meal breaks, preventing employees from leaving the premises during meal periods, requiring

6  employees to be "on call" while on purported meal breaks, failing to provide rest periods and

7  retaliating against employees who request to use the restroom or take a rest period while on duty.

8  In one instance, while stationed in the summer heat of the Imperial Valley desert and denied a rest

9  period, an Akal employee passed out from heat exhaustion.   In another instance, an Akal

10  employee was denied relief from her station post and consequently defecated herself.

11  **SPECIAL INTERROGATORY NO. 2:**

12          IDENTIFY each and every PERSON whom YOU believe has knowledge regarding

13  YOUR contention that during the past four years AKAL failed to provide rest and meal periods of

14  compensation in lieu thereof. (For purposes of these Interrogatories, the term: (1) "IDENTIFY" or

15  "IDENTIFIED", with respect to a natural PERSON or entity, means to state the name, address and

16  telephone number of PERSON or entity; IDENTIFY or IDETIFIED, with respect to a

17  DOCUMENT, means to describe the DOCUMENT with sufficient particularity so that it can

18  properly be made the subject of an inspection demand; (2) "PERSON" means any natural person

19  or any business, legal or governmental entity or association; and (3) "AKAL" means Defendant

20  Akal Security, Inc.)

21  **RESPONSE TO SPECIAL INTERROGATORY NO. 2:**

22          This responding party objects to this interrogatory to the extent that it seeks information

23  which is protected by the attorney-client privilege and/or work product doctrine.  In addition, this

24  interrogatory is overbroad, oppressive, burdensome and calls for a legal conclusion.  However,

25  without waiving the foregoing objections, this responding party responds as follows:

26          David Loera, Carlos Luna, Mike Flores, Victor Salgado, James Platt, Joaquin Reclosado,

27  Guillermo Echeverria, Benny Hamilton and all guards working for Akal in California from April

28  15, 2002 to the present.

N&B
ATTORNEYS AT LAW
SAN DIEGO

4

373  D

RESPONSES TO SPECIAL INTERROGATORIES PROPOUNDED BY DEFENDANT AKAL SECURTY, INC.

**SPECIAL INTERROGATORY NO. 3:**

IDENTIFY each and every DOCUMENT that YOU maintain which supports or refers to YOUR contention that during the past four years AKAL failed to provide rest and meal periods or compensation in lieu thereof. (For purposes of these Interrogatories, the term "DOCUMENT" means any "WRITING" as defined in Section 250 of the California *Evidence Code*.)

**RESPONSE TO SPECIAL INTERROGATORY NO. 3:**

This responding party objects to this interrogatory to the extent that it seeks information which is protected by the attorney-client privilege and/or work product doctrine. In addition, this interrogatory is overbroad, oppressive, burdensome and calls for a legal conclusion. However, without waiving the foregoing objections, this responding party responds as follows:

All non-privileged documents responsive to this request that are known to and in the possession of responding party at this time are served herewith.

**SPECIAL INTERROGATORY NO. 4:**

State all facts upon which YOU base YOUR contention that during the past four years AKAL failed to pay one hour wages in lieu of rest and meal periods when proper rest and meal periods were not provided.

**RESPONSE TO SPECIAL INTERROGATORY NO. 4:**

This responding party objects to this interrogatory to the extent that it seeks information which is protected by the attorney-client privilege and/or work product doctrine. In addition, this interrogatory is vague, ambiguous, overbroad, oppressive, burdensome and calls for a legal conclusion. However, without waiving the foregoing objections, this responding party responds as follows:

Akal fails to provide adequate rest and meal periods. In the absence of such rest and meal periods, Akal fails to provide premium pay. Many times, employees were told by Akal they were being paid at their normal rate during lunch while they were "on call." They were never told about the premium pay, nor were they paid the premium pay, in relation to missed rest and meal periods.

////

N&B
Attorneys At Law
San Diego

5

RESPONSES TO SPECIAL INTERROGATORIES PROPOUNDED BY DEFENDANT AKAL SECURITY, INC.

1    **SPECIAL INTERROGATORY NO. 5:**

2            IDENTIFY each and every PERSON whom YOU believe has knowledge regarding

3    YOUR contention that during the past four years AKAL failed to pay one hour wages in lieu of

4    rest and mean periods when proper rest and meal periods were not provided.

5    **RESPONSE TO SPECIAL INTERROGATORY NO. 5:**

6            This responding party objects to this interrogatory to the extent that it seeks information

7    which is protected by the attorney-client privilege and/or work product doctrine.  In addition, this

8    interrogatory is vague, ambiguous, overbroad, oppressive, burdensome and calls for a legal

9    conclusion.  However, without waiving the foregoing objections, this responding party responds

10   as follows:

11           See Response to Special Interrogatory No. 2.

12   **SPECIAL INTERROGATORY NO. 6:**

13           IDENTIFY each and every DOCUMENT that YOU maintain which supports or refers to

14   YOUR contention that during the past four years AKAL failed to pay one hour wages in lieu of

15   rest and meal periods when proper rest and meal periods were not provided.

16   **RESPONSE TO SPECIAL INTERROGATORY NO. 6:**

17           This responding party objects to this interrogatory to the extent that it seeks information

18   which is protected by the attorney-client privilege and/or work product doctrine.  In addition, this

19   interrogatory is vague, ambiguous, overbroad, oppressive, burdensome and calls for a legal

20   conclusion.  However, without waiving the foregoing objections, this responding party responds

21   as follows:

22           See Response to Special Interrogatory No. 3.

23   **SPECIAL INTERROGATORY NO. 7:**

24           State all facts upon which YOU base YOUR contention that during the past four years

25   AKAL "failed to provide Plaintiff...with accurate wage deduction statements showing the actual

26   hours worked by Plaintiff."

27   **RESPONSE TO SPECIAL INTERROGATORY NO. 7:**

28           This responding party objects to this interrogatory to the extent that it seeks information

1  which is protected by the attorney-client privilege and/or work product doctrine. In addition, this

2  interrogatory is overbroad, oppressive, burdensome and calls for a legal conclusion. However,

3  without waiving the foregoing objections, this responding party responds as follows:

4      Employees of Akal were not provided with accurate wage deduction statements. Akal did

5  not provide adequate rest and meal periods. Akal failed to provide premium pay when adequate

6  rest and meal periods were not provided. Wage deduction statements were not provided to record

7  the required information. Nor did the wage deduction statements show the premium pay.

8  Furthermore, on more than one occasion, Akal deducted paid-time-off from my wage deduction

9  statements when I did not take the time off.

10  **SPECIAL INTERROGATORY NO. 8:**

11      IDENTIFY each and every PERSON whom YOU believe has knowledge regarding

12  YOUR contention that during the past four years AKAL "failed to provide Plaintiff...with

13  accurate wage deduction statements showing the actual hours worked by Plaintiff."

14  **RESPONSE TO SPECIAL INTERROGATORY NO. 8:**

15      This responding party objects to this interrogatory to the extent that it seeks information

16  which is protected by the attorney-client privilege and/or work product doctrine. In addition, this

17  interrogatory is overbroad, oppressive, burdensome and calls for a legal conclusion. However,

18  without waiving the foregoing objections, this responding party responds as follows:

19      See Response to Special Interrogatory No. 2.

20  **SPECIAL INTERROGATORY NO. 9:**

21      IDENTIFY each and every DOCUMENT that YOU maintain which supports or refers to

22  YOUR contention that during the past four years AKAL "failed to provide Plaintiff...with

23  accurate wage deduction statements showing the actual hours worked by Plaintiff."

24  **RESPONSE TO SPECIAL INTERROGATORY NO. 9:**

25      This responding party objects to this interrogatory to the extent that it seeks information

26  which is protected by the attorney-client privilege and/or work product doctrine. In addition, this

27  interrogatory is overbroad, oppressive, burdensome and calls for a legal conclusion. However,

28  without waiving the foregoing objections, this responding party responds as follows:

N&B
Attorneys At Law
San Diego

RESPONSES TO SPECIAL INTERROGATORIES PROPOUNDED BY DEFENDANT AKAL SECURTY, INC.

1   See Response to Special Interrogatory No. 3.

2   **SPECIAL INTERROGATORY NO. 10:**

3   State all facts upon which YOU base YOUR contention that AKAL committed unlawful

4   business practices within the meaning of the UCL by "[c]ompelling Plaintiff...to work for periods

5   of five or more consecutive hours without having at least a one half hour break for meals." (For

6   purposes of these Interrogatories, the term "UCL" shall mean California's Unfair Competition

7   Law, codified at Business & Professions Code section 17200, et seq.)

8   **RESPONSE TO SPECIAL INTERROGATORY NO. 10:**

9   This responding party objects to this interrogatory to the extent that it seeks information

10  which is protected by the attorney-client privilege and/or work product doctrine. In addition, this

11  interrogatory is overbroad, oppressive, burdensome and calls for a legal conclusion. However,

12  without waiving the foregoing objections, this responding party responds as follows:

13  Akal fails to provide adequate rest and meal periods. In the absence of such rest and meal

14  periods, Akal fails to provide premium pay. Akal employees were consistently denied an

15  uninterrupted meal break of at least thirty minutes for every five hours. Instances of such

16  wrongful conduct by Akal include, but are not limited to, limiting meal periods to twenty minutes,

17  requiring meals to be eaten while at security post, requiring employees to answer phones while on

18  purported meal breaks, preventing employees from leaving the premises, and requiring employees

19  to be "on call" while on purported meal breaks.

20  **SPECIAL INTERROGATORY NO. 11:**

21  IDENTIFY each and every PERSON whom YOU believe has knowledge regarding

22  YOUR contention that AKAL committed unlawful business practices within the meaning of the

23  UCL by "[c]ompelling Plaintiff...to work for periods of five or more consecutive hours without

24  having at least a one half hour break for meals."

25  **RESPONSE TO SPECIAL INTERROGATORY NO. 11:**

26  This responding party objects to this interrogatory to the extent that it seeks information

27  which is protected by the attorney-client privilege and/or work product doctrine. In addition, this

28  interrogatory is overbroad, oppressive, burdensome and calls for a legal conclusion. However,

**N&B**
ATTORNEYS AT LAW
SAN DIEGO

8

377 D

RESPONSES TO SPECIAL INTERROGATORIES PROPOUNDED BY DEFENDANT AKAL SECURTY, INC.

1   without waiving the foregoing objections, this responding party responds as follows:

2       See Response to Special Interrogatory No. 2.

3   **SPECIAL INTERROGATORY NO. 12:**

4       IDENTIFY each and every DOCUMENT whom YOU maintain which supports or refers

5   to YOUR contention that AKAL committed unlawful business practices within the meaning of the

6   UCL by "[c]ompelling Plaintiff...to work for periods of five or more consecutive hours without

7   having at least a one half hour break for meals."

8   **RESPONSE TO SPECIAL INTERROGATORY NO. 12:**

9       This responding party objects to this interrogatory to the extent that it seeks information

10  which is protected by the attorney-client privilege and/or work product doctrine.  In addition, this

11  interrogatory is overbroad, oppressive, burdensome and calls for a legal conclusion.  However,

12  without waiving the foregoing objections, this responding party responds as follows:

13      See Response to Special Interrogatory No. 3.

14  **SPECIAL INTERROGATORY NO. 13:**

15      State all facts upon which YOU base YOUR contention that AKAL committed unlawful

16  business practices within the meaning of the UCL by "[c]ompelling Plaintiff...to work for periods

17  of four or more consecutive hours without having at least a one ten minute rest period."

18  **RESPONSE TO SPECIAL INTERROGATORY NO. 13:**

19      This responding party objects to this interrogatory to the extent that it seeks information

20  which is protected by the attorney-client privilege and/or work product doctrine.  In addition, this

21  interrogatory is overbroad, oppressive, burdensome and calls for a legal conclusion.  However,

22  without waiving the foregoing objections, this responding party responds as follows:

23      Akal fails to provide adequate rest and meal periods.  In the absence of such rest and meal

24  periods, Akal fails to provide premium pay.  Akal employees were consistently denied a break of

25  at least ten minutes for every four hours worked.  Furthermore, Akal fails to provide a convenient

26  location within the facility where rest periods can take place.  Instances of such wrongful conduct

27  by Akal include, but are not limited to, failing to provide rest periods and issuing penalties upon

28  employees for requesting to use restroom while on duty.  In one instance, while stationed in the

N&B
ATTORNEYS AT LAW
SAN DIEGO

9

378 D

RESPONSES TO SPECIAL INTERROGATORIES PROPOUNDED BY DEFENDANT AKAL SECURTY, INC.

1    summer heat of the Imperial Valley desert and denied a rest period, an Akal employee passed out

2    from heat exhaustion. In another instance, an Akal employee was denied relief from her station

3    post and consequently defecated herself.

4    **SPECIAL INTERROGATORY NO. 14:**

5        IDENTIFY each and every PERSON whom YOU believe has knowledge regarding

6    YOUR contention that AKAL committed unlawful business practices within the meaning of the

7    UCL by "[c]ompelling Plaintiff...to work for periods of four or more consecutive hours without

8    having at least a ten minute rest period."

9    **RESPONSE TO SPECIAL INTERROGATORY NO. 14:**

10        This responding party objects to this interrogatory to the extent that it seeks information

11    which is protected by the attorney-client privilege and/or work product doctrine. In addition, this

12    interrogatory is overbroad, oppressive, burdensome and calls for a legal conclusion. However,

13    without waiving the foregoing objections, this responding party responds as follows:

14        See Response to Special Interrogatory No. 2.

15    **SPECIAL INTERROGATORY NO. 15:**

16        IDENTIFY each and every DOCUMENT that YOU maintain which supports or refers to

17    YOUR contention that AKAL committed unlawful business practices within the meaning of the

18    UCL by "[c]ompelling Plaintiff...to work for periods of four or more consecutive hours without

19    having at least a one ten minute rest period."

20    **RESPONSE TO SPECIAL INTERROGATORY NO. 15:**

21        This responding party objects to this interrogatory to the extent that it seeks information

22    which is protected by the attorney-client privilege and/or work product doctrine. In addition, this

23    interrogatory is overbroad, oppressive, burdensome and calls for a legal conclusion. However,

24    without waiving the foregoing objections, this responding party responds as follows:

25        See Response to Special Interrogatory No. 3.

26    **SPECIAL INTERROGATORY NO. 16:**

27        State all facts upon which YOU base YOUR contention that AKAL committed unlawful

28    business practices within the meaning of the UCL by "[f]ailing to post required notices at the

N&B
ATTORNEYS AT LAW
SAN DIEGO

10

379 0

RESPONSES TO SPECIAL INTERROGATORIES PROPOUNDED BY DEFENDANT AKAL SECURITY, INC.

1  workplace."

2  **RESPONSE TO SPECIAL INTERROGATORY NO. 16:**

3       This responding party objects to this interrogatory to the extent that it seeks information

4  which is protected by the attorney-client privilege and/or work product doctrine.  In addition, this

5  interrogatory is overbroad, oppressive, burdensome and calls for a legal conclusion.  However,

6  without waiving the foregoing objections, this responding party responds as follows:

7       The wage orders were not posted for employees to see, as required.  Employees were not

8  able to plainly view the pertinent governing law on wages, hours, rest periods, and meal periods.

9  **SPECIAL INTERROGATORY NO. 17:**

10       IDENTIFY each and every PERSON whom YOU believe has knowledge regarding

11  YOUR contention that AKAL committed unlawful business practices within the meaning of the

12  UCL by "[f]ailing to post required notices at the workplace."

13  **RESPONSE TO SPECIAL INTERROGATORY NO. 17:**

14       This responding party objects to this interrogatory to the extent that it seeks information

15  which is protected by the attorney-client privilege and/or work product doctrine.  In addition, this

16  interrogatory is overbroad, oppressive, burdensome and calls for a legal conclusion.  However,

17  without waiving the foregoing objections, this responding party responds as follows:

18       See Response to Special Interrogatory No. 2.

19  **SPECIAL INTERROGATORY NO. 18:**

20       IDENTIFY each and every DOCUMENT that YOU maintain which supports or refers to

21  YOUR contention that AKAL committed unlawful business practices within the meaning of the

22  UCL by "[f]ailing to post required notices at the workplace."

23  **RESPONSE TO SPECIAL INTERROGATORY NO. 18:**

24       This responding party objects to this interrogatory to the extent that it seeks information

25  which is protected by the attorney-client privilege and/or work product doctrine.  In addition, this

26  interrogatory is overbroad, oppressive, burdensome and calls for a legal conclusion.  However,

27  without waiving the foregoing objections, this responding party responds as follows:

28       See Response to Special Interrogatory No. 3.

N&B
ATTORNEYS AT LAW
SAN DIEGO

11

RESPONSES TO SPECIAL INTERROGATORIES PROPOUNDED BY DEFENDANT AKAL SECURITY, INC.

1    **SPECIAL INTERROGATORY NO. 19:**

2        State all facts upon which YOU base YOUR contention that AKAL committed unlawful

3    business practices within the meaning of the UCL by "[f]ailing to provide accurate and itemized

4    wage statements required under California Law."

5    **RESPONSE TO SPECIAL INTERROGATORY NO. 19:**

6        This responding party objects to this interrogatory to the extent that it seeks information

7    which is protected by the attorney-client privilege and/or work product doctrine. In addition, this

8    interrogatory is overbroad, oppressive, burdensome and calls for a legal conclusion. However,

9    without waiving the foregoing objections, this responding party responds as follows:

10       Employees of Akal were not provided with accurate wage deduction statements. Akal did

11   not provide adequate rest and meal periods. Akal failed to provide premium pay when adequate

12   rest and meal periods were not provided. Wage deduction statements were not provided to record

13   the required information. Nor did the wage deduction statements show the premium pay.

14   Furthermore, on more than one occasion, Akal deducted paid-time-off from my wage deduction

15   statements when I did not take the time off.

16   **SPECIAL INTERROGATORY NO. 20:**

17       IDENTIFY each and every PERSON whom YOU believe has knowledge regarding

18   YOUR contention that AKAL committed unlawful business practices within the meaning of the

19   UCL by "[f]ailing to provide accurate and itemized wage statements required under California

20   Law."

21   **RESPONSE TO SPECIAL INTERROGATORY NO. 20:**

22       This responding party objects to this interrogatory to the extent that it seeks information

23   which is protected by the attorney-client privilege and/or work product doctrine. In addition, this

24   interrogatory is overbroad, oppressive, burdensome and calls for a legal conclusion. However,

25   without waiving the foregoing objections, this responding party responds as follows:

26       See Response to Special Interrogatory No. 2.

27   **SPECIAL INTERROGATORY NO. 21:**

28       IDENTIFY each and every DOCUMENT that YOU maintain which supports or refers to

N&B

ATTORNEYS AT LAW
SAN DIEGO

12

381 D

1    YOUR contention that AKAL committed unlawful business practices within the meaning of the

2    UCL by "[f]ailing to provide accurate and itemized wage statements required under California

3    Law."

4    **RESPONSE TO SPECIAL INTERROGATORY NO. 21:**

5        This responding party objects to this interrogatory to the extent that it seeks information

6    which is protected by the attorney-client privilege and/or work product doctrine. In addition, this

7    interrogatory is overbroad, oppressive, burdensome and calls for a legal conclusion. However,

8    without waiving the foregoing objections, this responding party responds as follows:

9        See Response to Special Interrogatory No. 3.

10   **SPECIAL INTERROGATORY NO. 22:**

11       State all facts upon which YOU base YOUR contention that AKAL committed unlawful

12   business practices within the meaning of the UCL by "[f]ailing to prepare and maintain all records

13   required by California Law."

14   **RESPONSE TO SPECIAL INTERROGATORY NO. 22:**

15       This responding party objects to this interrogatory to the extent that it seeks information

16   which is protected by the attorney-client privilege and/or work product doctrine. In addition, this

17   interrogatory is overbroad, oppressive, burdensome and calls for a legal conclusion. However,

18   without waiving the foregoing objections, this responding party responds as follows:

19       Akal failed to keep records showing the beginning and ending of each work period, the

20   total daily hours worked, the total hours worked per pay period, and the beginning and end of

21   meal periods. Furthermore, employees of Akal were not provided with accurate wage deduction

22   statements.

23   **SPECIAL INTERROGATORY NO. 23:**

24       IDENTIFY each and every PERSON whom YOU believe has knowledge regarding

25   YOUR contention that AKAL committed unlawful business practices within the meaning of the

26   UCL by "[f]ailing to prepare and maintain all records required by California Law."

27   **RESPONSE TO SPECIAL INTERROGATORY NO. 23:**

28       This responding party objects to this interrogatory to the extent that it seeks information

1  which is protected by the attorney-client privilege and/or work product doctrine.  In addition, this
2  interrogatory is overbroad, oppressive, burdensome and calls for a legal conclusion.  However,
3  without waiving the foregoing objections, this responding party responds as follows:

4        See Response to Special Interrogatory No. 2.

5  **SPECIAL INTERROGATORY NO. 24:**

6        IDENTIFY each and every DOCUMENT that YOU maintain which supports or refers to
7  YOUR contention that AKAL committed unlawful business practices within the meaning of the
8  UCL by "[f]ailing to prepare and maintain all records required by California Law."

9  **RESPONSE TO SPECIAL INTERROGATORY NO. 24:**

10       This responding party objects to this interrogatory to the extent that it seeks information
11 which is protected by the attorney-client privilege and/or work product doctrine.  In addition, this
12 interrogatory is overbroad, oppressive, burdensome and calls for a legal conclusion.  However,
13 without waiving the foregoing objections, this responding party responds as follows:

14       See Response to Special Interrogatory No. 3.

15 **SPECIAL INTERROGATORY NO. 25:**

16       State all facts upon which YOU base YOUR contention that AKAL engaged in "blatant,
17 egregious and flagrant violations of the California Labor Code and the Industrial Welfare
18 Commission ("IWC") Wage Orders."

19 **RESPONSE TO SPECIAL INTERROGATORY NO. 25:**

20       This responding party objects to this interrogatory to the extent that it seeks information
21 which is protected by the attorney-client privilege and/or work product doctrine.  In addition, this
22 interrogatory is overbroad, oppressive, burdensome and calls for a legal conclusion.  However,
23 without waiving the foregoing objections, this responding party responds as follows:

24       Akal fails to provide adequate rest and meal periods.  In the absence of such rest and meal
25 periods, Akal fails to provide premium pay.  Akal employees were consistently denied an
26 uninterrupted meal break of at least thirty minutes for every five hours worked and consistently
27 denied a break of at least ten minutes for every four hours worked.  Instances of such wrongful
28 conduct by Akal include, but are not limited to, limiting meal periods to twenty minutes, requiring

N&B
ATTORNEYS AT LAW
SAN DIEGO

14

3930

RESPONSES TO SPECIAL INTERROGATORIES PROPOUNDED BY DEFENDANT AKAL SECURITY, INC.

1  meals to be eaten while at security post, requiring employees to answer phones while on purported
2  meal breaks, requiring employees to be "on call" while on purported meal breaks, preventing
3  employees from leaving the premises, failing to provide rest periods and retaliating against
4  employees who request to use the restroom or take rest periods while on duty.  In one instance,
5  while stationed in the summer heat of the Imperial Valley desert and denied a rest period, an Akal
6  employee passed out from heat exhaustion.  In another instance, an Akal employee was denied
7  relief from her station post and consequently defecated herself.

8      Employees of Akal were not provided with accurate wage deduction statements as
9  required by law.  Akal did not maintain records, as required, regarding the beginning and ending
10  of each work period, the total daily hours worked, the total hours worked per pay period, and the
11  beginning and end of meal periods.

12  **SPECIAL INTERROGATORY NO. 26:**

13      IDENTIFY each and every PERSON whom YOU believe has knowledge regarding
14  YOUR contention that AKAL engaged in "blatant, egregious and flagrant violations of the
15  California Labor Code and the Industrial Welfare Commission ("IWC") Wage Orders."

16  **RESPONSE TO SPECIAL INTERROGATORY NO. 26:**

17      This responding party objects to this interrogatory to the extent that it seeks information
18  which is protected by the attorney-client privilege and/or work product doctrine.  In addition, this
19  interrogatory is overbroad, oppressive, burdensome and calls for a legal conclusion.  However,
20  without waiving the foregoing objections, this responding party responds as follows:

21      See Response to Special Interrogatory No. 2.

22  **SPECIAL INTERROGATORY NO. 27:**

23      IDENTIFY each and every DOCUMENT that YOU maintain which supports or refers to
24  YOUR contention that AKAL engaged in "blatant, egregious and flagrant violations of the
25  California Labor Code and the Industrial Welfare Commission ("IWC") Wage Orders."

26  **RESPONSE TO SPECIAL INTERROGATORY NO. 27:**

27      This responding party objects to this interrogatory to the extent that it seeks information
28  which is protected by the attorney-client privilege and/or work product doctrine.  In addition, this

N&B
ATTORNEYS AT LAW
SAN DIEGO

15                    384    0

RESPONSES TO SPECIAL INTERROGATORIES PROPOUNDED BY DEFENDANT AKAL SECURITY, INC.

1  interrogatory is overbroad, oppressive, burdensome and calls for a legal conclusion. However,

2  without waiving the foregoing objections, this responding party responds as follows:

3        See Response to Special Interrogatory No. 3.

4  **SPECIAL INTERROGATORY NO. 28:**

5        State in full detail each and every fact relating to YOUR Attorney-Client fee agreement.

6  **RESPONSE TO SPECIAL INTERROGATORY NO. 28:**

7        This responding party objects to this interrogatory to the extent that it seeks information

8  which is protected by the attorney-client privilege. In addition, this interrogatory is overbroad,

9  oppressive and burdensome.

10  **SPECIAL INTERROGATORY NO. 29:**

11        State in full detail each and every fact regarding the rate of pay at which YOU were to be,

12  or were in fact compensated while employed by AKAL.

13  **RESPONSE TO SPECIAL INTERROGATORY NO. 29:**

14        This responding party objects to this interrogatory to the extent that it seeks information

15  which is protected by the attorney-client privilege and/or work product doctrine. In addition, this

16  interrogatory is overbroad, oppressive, burdensome and calls for a legal conclusion. However,

17  without waiving the foregoing objections, this responding party responds as follows:

18        The rate of pay was an hourly rate. Over the course of the employment, the rate has

19  changed. In 2003, I was paid $18.17 per hour, but consistently denied premium pay for missed

20  rest and meal periods. In 2004, I was paid $23.23 per hour, but consistently denied premium pay

21  for missed rest and meal periods.

22  **SPECIAL INTERROGATORY NO. 30:**

23        IDENTIFY the person most knowledgeable regarding YOUR wages.

24  **RESPONSE TO SPECIAL INTERROGATORY NO. 30:**

25        This responding party objects to this interrogatory to the extent that it seeks information

26  which is protected by the attorney-client privilege and/or work product doctrine. In addition, this

27  interrogatory is overbroad, oppressive, burdensome and calls for a legal conclusion. However,

28  without waiving the foregoing objections, this responding party responds as follows:

N&B
ATTORNEYS AT LAW
SAN DIEGO

16

3850

RESPONSES TO SPECIAL INTERROGATORIES PROPOUNDED BY DEFENDANT AKAL SECURTY, INC.

1    Joaquin Reclosado, Jeffrey Floyd, David Loera.

2    **SPECIAL INTERROGATORY NO. 31:**

3    IDENTIFY each and every DOCUMENT that YOU maintain regarding YOUR work

4    scheduling.

5    **RESPONSE TO SPECIAL INTERROGATORY NO. 31:**

6    This responding party objects to this interrogatory to the extent that it seeks information

7    which is protected by the attorney-client privilege and/or work product doctrine.  In addition, this

8    interrogatory is overbroad, oppressive, burdensome and calls for a legal conclusion.  However,

9    without waiving the foregoing objections, this responding party responds as follows:

10    See Response to Special Interrogatory No. 3.

11    **SPECIAL INTERROGATORY NO. 32:**

12    IDENTIFY each and every DOCUMENT that YOU maintain that relates or refers to any

13    time records, diaries, notes, memoranda, training schedules, work schedules, day planners, or

14    calendar entries of any kind kept by YOU in connection with YOUR employment with AKAL.

15    **RESPONSE TO SPECIAL INTERROGATORY NO. 32:**

16    This responding party objects to this interrogatory to the extent that it seeks information

17    which is protected by the attorney-client privilege and/or work product doctrine.  In addition, this

18    interrogatory is overbroad, oppressive, burdensome and calls for a legal conclusion.  However,

19    without waiving the foregoing objections, this responding party responds as follows:

20    See Response to Special Interrogatory No. 3.

21    **SPECIAL INTERROGATORY NO. 33:**

22    IDENTIFY each and every DOCUMENT that YOU maintain that reflects the hours YOU

23    worked each and every day during YOUR employment with AKAL.

24    **RESPONSE TO SPECIAL INTERROGATORY NO. 33:**

25    This responding party objects to this interrogatory to the extent that it seeks information

26    which is protected by the attorney-client privilege and/or work product doctrine.  In addition, this

27    interrogatory is overbroad, oppressive, burdensome and calls for a legal conclusion.  However,

28    without waiving the foregoing objections, this responding party responds as follows:

N&B
ATTORNEYS AT LAW
SAN DIEGO

17

386    O

RESPONSES TO SPECIAL INTERROGATORIES PROPOUNDED BY DEFENDANT AKAL SECURITY, INC.

1    See Response to Special Interrogatory No. 3.

2    **INTERROGATORY NO. 34:**

3    IDENTIFY each and every DOCUMENT that YOU maintain that relates to, refers to, or

4    shows any written or recorded statements obtained from any individual concerning the subject

5    matter of this lawsuit.

6    **RESPONSE TO SPECIAL INTERROGATORY NO. 34:**

7    This responding party objects to this interrogatory to the extent that it seeks information

8    which is protected by the attorney-client privilege and/or work product doctrine. In addition, this

9    interrogatory is overbroad, oppressive, burdensome and calls for a legal conclusion. However,

10    without waiving the foregoing objections, this responding party responds as follows:

11    See Response to Special Interrogatory No. 3.

12

13                                    NICHOLAS & BUTLER, LLP

14

15    Dated: October 27, 2006          By: _____
                                            Matthew B. Butler
16                                          Attorneys for Plaintiffs

17

18

19

20

21

22

23

24

25

26

27

28

N&B
ATTORNEYS AT LAW
SAN DIEGO

18

RESPONSES TO SPECIAL INTERROGATORIES PROPOUNDED BY DEFENDANT AKAL SECURITY, INC.

1  *Loera v. Akal Security, Inc.*
   Superior Court Case No.: ECU 03022

2

3                    **VERIFICATION**

4

5      I, David Loera, hereby declare and state as follows:

6      I am a Plaintiff in this action. I have read the foregoing **PLAINTIFF DAVID LOERA'S**

7  **RESPONSES TO SPECIAL INTERROGATORIES (SET ONE)** and know the contents

8  thereof. The same is true of my own knowledge, except as to those matters which are therein

9  stated upon my information and belief; and as to those matters, I believe it to be true. I declare

10 under penalty of perjury under the laws of the State of California that the foregoing is true and

11 correct.

12

13

14 Dated: October 27, 2006

   David Loera

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                         VERIFICATION

                                              388  D

STEPHEN E. RONK (SBN: 164333)
JOSHUA B. WAGNER (SBN: 199570)
MOLLIE BURKS-THOMAS (SBN: 222112)
GORDON & REES LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071
Telephone: (213) 576-5000
Facsimile: (213) 680-4470

Attorneys For: Defendant
AKAL SECURITY, INC.

SUPERIOR COURT OF CALIFORNIA - COUNTY OF IMPERIAL

DAVID LOERA, for himself and on behalf of all others similarly situated and the general public

                    Plaintiffs,

v.

AKAL SECURITY, INC., a corporation; and DOES 1-100, inclusive

                    Defendants.

CASE NO. ECU03022

*[Assigned to Hon. Christopher W. Yeager, Dept. 1]*

**DEFENDANT AKAL SECURITY, INC.'S FIRST SET OF SPECIAL INTERROGATORIES TO PLAINTIFF DAVID LOERA**

Complaint Filed:    April 27, 2006
Trial Date:        Not Set

**PROPOUNDING PARTY:**    **DEFENDANT AKAL SECURITY, INC.**

**RESPONDING PARTY:**    **PLAINTIFF DAVID LOERA**

**SET NO:**    **ONE**

Pursuant to Section 2030.010 *et seq.* of the California Code of Civil Procedure, Defendant Akal Security, Inc. ("Defendant") hereby requests that Plaintiff David Loera respond to the following special interrogatories separately and fully in writing and under oath, within 35 days after service of these special interrogatories by mail.

### INSTRUCTIONS

(A)    You are required to answer these interrogatories drawing upon all materials in your possession, ownership, custody or control, including materials which you have a right to

389    0

1  secure from any other source.  You must provide all information in response to an interrogatory

2  which is known to you, your agents, employees, accountants or attorneys, or which appears in

3  your records.  If you cannot answer an interrogatory after conducting a reasonable investigation,

4  you should answer to the extent you can, stating what information you do have, what information

5  you cannot provide and stating what efforts you made to obtain the unknown information.

6      (B)    In the event that you file a proper and timely objection to any interrogatory,

7  answer all portions of that interrogatory that do not fall within your objection.  For instance, if

8  you object to an interrogatory on the ground that it is too broad because it asks for information

9  concerning years you contend are not relevant to this lawsuit, at least provide an answer for all

10  years you admit are relevant to this lawsuit.

11      (C)    If you contend that you may not answer a question on the ground that some or all

12  of the requested information is protected or privileged, set forth the privilege claimed, the facts

13  on which you rely to support your claim of privilege, and the scope of the privilege.  Proceed to

14  answer with all requested information for which protection or privilege is not claimed.

15                    **SPECIAL INTERROGATORIES**

16  **SPECIAL INTERROGATORY NO. 1:**

17      State all facts upon which YOU based YOUR contention that during the past four years

18  AKAL failed to provide rest and meal periods or compensation in lieu thereof.  (For purposes of

19  these Interrogatories, the terms  "YOU" and "YOUR" means Plaintiff David Loera, and other

20  any natural person or any business, legal or governmental entity or association acting or

21  purporting to act on plaintiff's behalf.)

22  **SPECIAL INTERROGATORY NO. 2:**

23      IDENTIFY each and every PERSON whom YOU believe has knowledge regarding

24  YOUR contention that during the past four years AKAL failed to provide rest and meal periods

25  or compensation in lieu thereof. (For purposes of these Interrogatories, the terms:  (1)

26  "IDENTIFY" or "IDENTIFIED", with respect to a natural PERSON or entity, means to state the

27  name, address and telephone number of the PERSON or entity; IDENTIFY or IDENTIFIED,

28  with respect to a DOCUMENT, means to describe the DOCUMENT with sufficient particularity

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA  90071

-2-

3900

so that it can properly be made the subject of an inspection demand; (2) "PERSON" means any natural person or any business, legal or governmental entity or association; and (3) "AKAL" means Defendant Akal Security, Inc.)

**SPECIAL INTERROGATORY NO. 3:**

IDENTIFY each and every DOCUMENT that YOU maintain which supports or refers to YOUR contention that during the past four years AKAL failed to provide rest and meal periods or compensation in lieu thereof. (For purposes of these Interrogatories, the term "DOCUMENT" means any "WRITING" as defined in Section 250 of the California *Evidence Code*.)

**SPECIAL INTERROGATORY NO. 4:**

State all facts upon which YOU base YOUR contention that during the past four years AKAL failed to pay one hour wages in lieu of rest and meal periods when proper rest and meal periods were not provided.

**SPECIAL INTERROGATORY NO. 5:**

IDENTIFY each and every PERSON whom YOU believe has knowledge regarding YOUR contention that during the past four years AKAL failed to pay one hour wages in lieu of rest and meal periods when proper rest and meal periods were not provided.

**SPECIAL INTERROGATORY NO. 6:**

IDENTIFY each and every DOCUMENT that YOU maintain which supports or refers to YOUR contention that during the past four years AKAL failed to pay one hour wages in lieu of rest and meal periods when proper rest and meal periods were not provided.

**SPECIAL INTERROGATORY NO. 7:**

State all facts upon which YOU base YOUR contention that during the past four years AKAL "failed to provide Plaintiff . . . with accurate wage deduction statements showing the actual hours worked by Plaintiff."

**SPECIAL INTERROGATORY NO. 8:**

IDENTIFY each and every PERSON whom YOU believe has knowledge regarding YOUR contention that during the past four years AKAL "failed to provide Plaintiff . . . with accurate wage deduction statements showing the actual hours worked by Plaintiff."

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

*391 D*

-3-

DEFENDANT AKAL SECURITY, INC.'S FIRST SET OF SPECIAL INTERROGATORIES TO PLAINTIFF DAVID LOERA

**SPECIAL INTERROGATORY NO. 21:**

IDENTIFY each and every DOCUMENT that YOU maintain which supports or refers to YOUR contention that AKAL committed unlawful business practices within the meaning of the UCL by "[f]ailing to provide accurate and itemized wage statements required under California law."

**SPECIAL INTERROGATORY NO. 22:**

State all facts upon which YOU base YOUR contention that AKAL committed unlawful business practices within the meaning of the UCL by "[f]ailing to prepare and maintain all records required by California law."

**SPECIAL INTERROGATORY NO. 23:**

IDENTIFY each and every PERSON whom YOU believe has knowledge regarding YOUR contention that AKAL committed unlawful business practices within the meaning of the UCL by "[f]ailing to prepare and maintain all records required by California law."

**SPECIAL INTERROGATORY NO. 24:**

IDENTIFY each and every DOCUMENT that YOU maintain which supports or refers to YOUR contention that AKAL committed unlawful business practices within the meaning of the UCL by "[f]ailing to prepare and maintain all records required by California law."

**SPECIAL INTERROGATORY NO. 25:**

State all facts upon which YOU base YOUR contention that AKAL engaged in "blatant, egregious and flagrant violations of the California Labor Code and the Industrial Welfare Commission ("IWC") Wage Orders."

**SPECIAL INTERROGATORY NO. 26:**

IDENTIFY each and every PERSON whom YOU believe has knowledge regarding YOUR contention that AKAL engaged in "blatant, egregious and flagrant violations of the California Labor Code and the Industrial Welfare Commission ("IWC") Wage Orders."

**SPECIAL INTERROGATORY NO. 27:**

IDENTIFY each and every DOCUMENT that YOU maintain which supports or refers to YOUR contention that AKAL "blatant, egregious and flagrant violations of the California Labor

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

-6-

392 D

1 | Code and the Industrial Welfare Commission ("IWC") Wage Orders."

2 | **SPECIAL INTERROGATORY NO. 28:**

3 | State in full detail each and every fact relating to YOUR Attorney-Client fee agreement.

4 | **SPECIAL INTERROGATORY NO. 29:**

5 | State in full detail each and every fact regarding the rate of pay at which YOU were to be,

6 | or were in fact compensated while employed by AKAL.

7 | **SPECIAL INTERROGATORY NO. 30:**

8 | IDENTIFY the person most knowledgeable regarding YOUR wages.

9 | **SPECIAL INTERROGATORY NO. 31:**

10 | IDENTIFY each and every DOCUMENT that YOU maintain regarding YOUR work

11 | scheduling.

12 | **SPECIAL INTERROGATORY NO. 32:**

13 | IDENTIFY each and every DOCUMENT that YOU maintain that relates or refers to any

14 | time records, diaries, notes, memoranda, training schedules, work schedules, day planners, or

15 | calendar entries of any kind kept by YOU in connection with YOUR employment with AKAL.

16 | **SPECIAL INTERROGATORY NO. 33:**

17 | IDENTIFY each and every DOCUMENT that YOU maintain that reflects the hours YOU

18 | worked each and every day during YOUR employment with AKAL.

19 | **SPECIAL INTERROGATORY NO. 34:**

20 | IDENTIFY each and every DOCUMENT that YOU maintain that relates to, refers to, or

21 | shows any written or recorded statements obtained from any individual concerning the subject

22 | matter of this lawsuit.

23 | Dated: September 7, 2006

GORDON & REES LLP

25 | By: _____

26 | Stephen E. Ronk
Joshua B. Wagner
Mollie Burks-Thomas

27 | Attorneys For Defendant
AKAL SECURITY, INC.

*Left margin:* Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

DEFENDANT AKAL SECURITY, INC.'S FIRST SET OF SPECIAL INTERROGATORIES TO PLAINTIFF
DAVID LOERA

1

## PROOF OF SERVICE

2        I am a resident of the State of California, over the age of eighteen years, and not a party
to the within action.  My business address is:  633 West Fifth Street, Suite 4900, Los Angeles,
3    CA  90071.  On September 7, 2006, I served the within documents:

4    **DEFENDANT AKAL SECURITY, INC.'S FIRST SET OF SPECIAL
INTERROGATORIES TO PLAINTIFF DAVID LOERA**

5

6    ☐  by transmitting via facsimile the document(s) listed above to the fax number(s) set
forth below on this date before 5:00 p.m.

7    ☒  by placing the document(s) listed above in a sealed envelope with postage thereon
fully prepaid, in United States mail in the State of California at Los Angeles,
8    addressed as set forth below.

9    ☐  by personally delivering the document(s) listed above to the person(s) at the
address(es) set forth below.

10

11        Jason R. Thornton, Esq.
MARKS, GOLIA & FINCH LLP
3900 Harney Street
12    First Floor
San Diego, CA  92110-2825

13

14        Matthew B. Butler, Esq.
NICHOLAS & BUTLER, LLP
15    225 Broadway, 19th Floor
San Diego, CA  92101-5005

16

17        I am readily familiar with the firm's practice of collection and processing correspondence
for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same
18    day with postage thereon fully prepaid in the ordinary course of business.  I am aware that on
motion of the party served, service is presumed invalid if postal cancellation date or postage
19    meter date is more than one day after the date of deposit for mailing in affidavit.

20        I declare under penalty of perjury under the laws of the State of California that the above
is true and correct.

21        Executed on September 7, 2006, at Los Angeles, California.

22

23

24                                          _Sandy Halvorsen_
Sandy Halvorsen

25

26

27

28

394 D

1  STEPHEN E. RONK (SBN: 164333)
   JOSHUA B. WAGNER (SBN: 199570)
2  MOLLIE BURKS-THOMAS (SBN: 222112)
   GORDON & REES LLP
3  633 West Fifth Street, Suite 4900
   Los Angeles, CA 90071
4  Telephone: (213) 576-5000
   Facsimile: (213) 680-4470
5
   Attorneys for Defendant
6  AKAL SECURITY, INC.



ENDORSED

NOV 05 2007

SUPERIOR COURT
IMPERIAL COUNTY
JOSE O. GUILLEN, CLERK
BY MONICA PEREZ
DEPUTY

7

8                SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                       FOR THE COUNTY OF IMPERIAL

10

11 DAVID LOERA, for himself and on behalf of    ) CASE NO. ECU03022
   all others similarly situated and the general  )
12 public,                                        ) *[Assigned to Hon. Christopher W. Yeager,*
                                                  ) *Dept. 7]*
13                          Plaintiffs,            )
                                                  ) **DECLARATION OF JOHN AGLE IN**
14            v.                                   ) **SUPPORT OF DEFENDANT AKAL**
                                                  ) **SECURITY, INC.'S MOTION FOR**
15 AKAL SECURITY, INC., a corporation; and        ) **SUMMARY JUDGMENT, OR, IN THE**
   DOES 1-100, inclusive,                         ) **ALTERNATIVE, SUMMARY**
16                                                ) **ADJUDICATION**
                            Defendants.           )
17                                                )
                                                  )
18                                                ) Date:  January 23, 2008
                                                  ) Time:  8:30 a.m.
19                                                ) Dept.:  7
                                                  )
20 _____ ) Complaint Filed:    April 27, 2006
                                                  ) Trial Date:         Not Set
21

22

23

24        I, John Agle, hereby declare:

25        I declare under penalty of perjury under the laws of the State of California that the

26 foregoing is true and correct.

27        1.        I am the Vice President and Manager of LandAmerica Commercial Services, a

28 commercial property title company located at 750 "B" Street, Suite 3000, San Diego, CA 92101.

                                           - 1 -
─────────────────────────────────────────────────────────────

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

1  2.  I have over 25 years experience in commercial property title insurance.

2  3.  My office completed a property title search for the El Centro Detention Center,

3 located in El Centro, California, Imperial County ("El Centro facility") (our order number

4 05720926-609-05). A true and correct copy of the title search and report for the El Centro

5 facility is attached to my Declaration as Exhibit "A."

6  4.  It is my opinion based upon my expertise in the property title field as well as my

7 review of the title report for the property in question, that the El Centro facility is owned by the

8 United States of America, Department of Justice, Immigration and Naturalization Service under

9 the Homeland Security Department in Fee.

10  5.  It is my opinion based upon my expertise in the property title field as well as my

11 review of the title report for the property in question, that the El Centro facility was acquired by

12 the United States Government over time and is made up of five parcels. Parcel 1 of the El

13 Centro facility was acquired by the Federal Government on December 19, 1940, by a Warranty

14 Deed from the City of El Centro. Parcel 2 of the El Centro facility was acquired by the Federal

15 Government on November 3, 1970, by a Grant Deed from the County of Imperial. Parcel 3 of

16 the El Centro facility was acquired by the Federal Government on December 9, 1970, by a Grant

17 Deed from the County of Imperial. Parcel 4 of the El Centro facility was acquired by the Federal

18 Government on December 14, 1970, by a Grant Deed from the County of Imperial. Parcel 5 of

19 the El Centro facility was acquired by the Federal Government on September 27, 1985, by a

20 Corporation Grant Deed from El Centro Pizza, Inc.

21 Executed this ___8th___ of October, 2007 at ___San Diego___ California.

22

23     _____

24     JOHN AGLE
      Vice President and Manager, LandAmerica
      Commercial Services

25

26

27

28

Gordon & Rees LLP
633 West Fifth Street
Suite 4900
Los Angeles, CA 90071

- 2 -

DECLARATION OF JOHN AGLE IN SUPPORT OF DEFENDANT AKAL SECURITY, INC.'S
MOTION FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION

396 D



Commonwealth Land Title Company
750 "B" Street
Suite 3000
San Diego, CA 92101
Phone: (619) 233-3000

**Gordon & Rees LLP**
**633 West Fifth Street #4900**
**Los Angeles, CA 90071**

Our File No: 05720926 - 609 - 05
Commercial Title Officer: Danette Starling
e-mail: (dstarling@landam.com)
Phone: (619) 230-6350
Fax:     (619) 233-4607

Attn: **Joshua Wagner**

Your Reference No: Detention Center

Property Address:        , El Centro, California

# 1st Amended PRELIMINARY REPORT

Dated as of May 25, 2007 at 7:30 a.m.

In response to the above referenced application for a policy of title insurance, Commonwealth Land Title Company hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a Policy or Policies of Title Insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an Exception below or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations of said policy forms.

The printed Exceptions and Exclusions from the coverage and Limitations on Covered Risks of said Policy or Policies are set forth in Exhibit B attached. The policy to be issued may contain an arbitration clause. When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties. Limitations on Covered Risks applicable to the CLTA and ALTA Homeowner's Policies of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limit of Liability for certain coverages are also set forth in Exhibit B. Copies of the Policy forms should be read. They are available from the office which issued this report.

*Please read the exceptions shown or referred to below and the exceptions and exclusions set forth in Exhibit B of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered. It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects, and encumbrances affecting title to the land.*

This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.

CLTA Preliminary Report (Revised 11-17-06)

Page 1

397 0

File No:  05720926

# SCHEDULE A

The form of policy of title insurance contemplated by this report is:

**ALTA Owners 2006 Policy (6-17-06)**

The estate or interest in the land hereinafter described or referred to covered by this report is:

**A FEE**

Title to said estate or interest at the date hereof is vested in:

**The United States of America, Department of Justice, Immigration and Naturalization Service**

The land referred to herein is situated in the County of Imperial, State of California, and is described as follows:

### SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

398 D

File No: 05720926

# EXHIBIT "A"

All that certain real property situated in the County of Imperial, State of California, described as follows:


Parcel 1:


That portion of the Northwest Quarter of Tract 50, Township 15 South, Range 14 East, in the City of El Centro, County of Imperial, State of California, more particularly described as follows:

Beginning at a point on the West line of Tract 50, Township 15 South, Range 14 East, which point is the center line of U. S. Highway, Route No. 99, and which point is 50 feet South of the Northwest Corner of said Tract 50;
Thence North 89° 54' East and parallel with the North line of said Tract 50, 466.7 feet to a point;
Thence South and parallel with the West line of said Tract 50, 0° 03' West 466.7 feet to a point;
Thence West and parallel with the North line of said Tract 50, South 89° 54' West 466.7 feet to the center line of said U.S. Highway Route 99, and to the West line of said Tract 50;
Thence North 0° 03' East along the West line of said Tract 50, 466.7 feet to the point of beginning, and lying South of the 50 foot right-of-way of the Imperial Irrigation District in the Northwest Corner of said Tract 50.

Excepting therefrom that portion thereof condemned by the State of California by Order recorded February 26, 1947 in Book 673, Page 319 of Official Records.


Parcel 2:


That portion of the Northwest Quarter of Tract 50, Township 15 South, Range 14 East, in the City of El Centro, County of Imperial, State of California, and more particularly described as follows:

Beginning at the Northwest Corner of said Tract 50;thence North 89° 54' East along the North line of said Tract 50 666.7 feet, thence S. 0 03'W. parallel with the west line of said tract 50  50.00 feet to a 6" x 6" x 3' concrete monument; said monument being the Northeast Corner of the lease recorded in Book 1187, Page 15 of Official Records in the County Recorders' Office of said Imperial County, said point being the True Point of Beginning;Thence continuing South 0° 03' West along said East lease line 466.7 feet to a 6" x 6" x 3' concrete monument said monument being the Southeast Corner of said lease;

399 D

File No: 05720926

Thence North 89° 54' East, 649.42 feet to a 6" x 6" x 3' concrete monument in the West line of the Sherman Oaks Addition Number One, a Subdivision; the map of said Subdivision being on file at the County Recorders' Office as Final Map Book 2, Page 3;

Thence North 0° 7' West along said West line 466.7 feet to a 6" x 6" x 3' concrete monument said point being the Northwest Corner of Sherman Oaks Addition Number 2, a Subdivision, the map of said Subdivision being on file at the County Recorders' Office as Final Map Book 2, Page 11;

Thence South 89° 54' West parallel with the North line of said Tract 50 648.12 feet to the True Point of Beginning.

Excepting therefrom the East 30 feet for street purposes, by Resolution recorded April 27, 1955 in Book 909, Page 559, of Official Records.


Parcel 3:

That portion of the Northwest Quarter of Tract 50, Township 15 South, Range 14 East, in the City of El Centro, County of Imperial, State of California, and more particularly described as follows:

Beginning at the Northwest Corner of said Tract 50;

Thence North 89° 54' East along the North line of said Tract 50, 666.7 feet;

Thence South 0° 03' West parallel with the West line of said Tract 50, 50.00 feet to a 6" x 6" x 3' concrete monument, said monument being the Northeast Corner of the lease recorded in Book 1187, Page 15 of Official Records in the County Recorders Office of said Imperial County;

Thence continuing South 0° 03' West along said East lease line 466.7 feet to a 6" x 6" x 3' concrete monument said monument being the Southeast Corner of said lease;

Thence South 89° 54' West 200 feet along the South line of said lease to the Southwest Corner of said lease and the Northeast Corner of land described in Book 634, Page 471 of Official Records, said point being the True Point of Beginning;

Thence South 0° 03' West along the East line of said property described in Book 634, Page 471, 100 feet to a point in the East line of said property;

Thence North 89° 54' East 849.70 feet to a point in the West line of the Sherman Oaks Addition Number One, a subdivision, the map of said subdivision being on file at the County Recorders Office as Final Map Book 2, Page 3;

Thence North 0° 07' West along said subdivision line 100 feet to a 6" x 6" x 3' concrete monument, said monument being South 0° 07' East, 516.7 feet from the North line of said Tract 50;

Thence South 89° 54' West parallel with the North line of said Tract 50, 849.42 feet to the True Point of Beginning.

Excepting therefrom the East 30 feet for street purposes by Resolution recorded April 27, 1955 in Book 909, Page 559 of Official Records.

400 0

File No: 05720926

Parcel 4:

That portion of the Northwest Quarter of Tract 50, Township 15 South, Range 14 East, in the City of El Centro, County of Imperial, State of California, and more particularly described as follows:

Beginning at a point in the West line of said Tract 50 which point is 50 feet South of the Northwest Corner of said Tract;
Thence 89° 54' East and parallel with the North line of said Tract 466.7 feet to the True Point of Beginning; and being the Northeast corner of that parcel of real property described in Deed from City of El Centro, granter, to United States of America, grantee, dated December 19, 1940, recorded April 10, 1941 in Book 567, Page 257 of Official Records in the County Recorder's Office of said Imperial County;
Thence North 89° 54' East and parallel with the North line of said Tract 200 feet to a point;
Thence South 0° 03' West and parallel with the West line of said Tract 466.7 feet to a point;
Thence South 89 54' West and parallel with the North line of said Tract 200 feet to a point, being the Southeast Corner of that real property described in said aforementioned Deed from said City of El Centro to said United States of America;
Thence North 0° 03' East and parallel with the West line of said Tract 466.7 feet to the True Point of Beginning.


Parcel 5:

That portion of the Northwest Quarter of Tract 50, Township 15 South, Range 14 East, in the City of El Centro, County of Imperial, State of California, and more particularly described as follows:

Beginning at a point on the West line of said Tract 50, which point is 516.7 feet South of the Northwest corner of said Tract 50; and which point is also the Southwest Corner of the tract of land described in deed from The County of Imperial to The City of El Centro dated January 2, 1941, and recorded April 19, 1941 in Book 568, Page 164 of Official Records;
Thence North 89° 54' East and parallel with the North line of said Tract 50, and along the South line of said Tract, deeded to said City of El Centro, above referred to, 466.7 feet to a point, said point being the Southeast Corner of said City of El Centro Tract;
Thence South 0° 03' West and parallel with the West line of said Tract 50, 130 feet;
Thence South 89° 54' West and parallel with the North line of said Tract 50 and parallel with the South line of said City of El Centro Tract 466.7 feet to the West line of said Tract 50;

401 D

File No:  05720926

Thence North 0°' 03' East along the West line of said Tract 50 to the point of beginning.

Excepting therefrom that portion thereof condemned by the State of California by Order recorded February 26,1947 in Book 673, Page 319 of Official Records of Imperial County.

402 D

File No: 05720926

# SCHEDULE B – Section A

The following exceptions will appear in policies when providing standard coverage as outlined below:

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2. Any facts, rights, interests or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may asserted by persons in possession of the Land.

3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.

4. Any encroachment, encumbrance, violation, variation or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.

5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the Public Records.

403 0

File No: 05720926

# SCHEDULE B – Section B

At the date hereof Exceptions to coverage in addition to the printed exceptions and exclusions in said policy form would be as follows:

A. No taxes are due or payable at this time. Said Property is currently owned by a Governmental Agency.

1. An easement in favor of the public over any existing roads lying within said land.

2. The following reservations and/or provisions contained in the patent from the United States of America.
   Recorded:                    in Book 3, Page 263, of Patents

   Subject to any vested and accrued water rights for mining, agricultural, manufacturing or other purposes, and rights to ditches and reservoirs used in connection with such water rights as may be recognized and acknowledged by the local customs, laws and decisions of courts; also a right of way for ditches or canals constructed by authority of the United States as reserved in said patent.

3. An easement for the purpose shown below and rights incidental thereto as set forth in a document
   Granted to:          Imperial Irrigation District
   Purpose:             power line
   Recorded:            March 27, 1939 in Book 516, Page(s) 142, of Official Records
   Affects:             said land more particularly described therein.

4. An easement for the purpose shown below and rights incidental thereto as set forth in a document
   Granted to:          The United States of America
   Purpose:             an iron gas pipeline
   Recorded:            November 6, 1944 in Book 631, Page 6 of Official Records
   Affects:             said land more particularly described therein.

5. An easement for the purpose shown below and rights incidental thereto as set forth in a document
   Granted to:          United States of America
   Purpose:             an iron gas pipeline
   Recorded:            November 6,1944 in Book 631, Page 7 of Official Records
   Affects:             said land more particularly described therein.

6. An easement for the purpose shown below and rights incidental thereto as set forth in a document
   Granted to:          Imperial Irrigation District
   Purpose:             polelines
   Recorded:            September 17, 1947 in Book 683, Page 182 of Official Records
   Affects:             said land more particularly described therein.

404 D

File No: 05720926

7. The fact that the ownership of said land does not include any rights of ingress or egress to or from the freeway adjacent to said land, said rights having been relinquished by deed to the State of California,

Recorded:                  February 26, 1947 in Book 673, Page 319, of Official Records

Said document further recites:

"Excepting and reserving, however, to the owners of abutting lands, their successors or assigns, the right of access to said freeway over and across the Easterly line of the above described parcel for two 30 foot sections, which said sections lie 15 feet each side of points directly opposite of Engineer's Stations 17/77 and 20/15 of said survey."

8. An easement for the purpose shown below and rights incidental thereto as reserved in a document

Purpose:           Quality Dairy of Imperial Valley Inc., a Corporation
Recorded:          roadway
Affects:           parallel with and adjacent to and East of the East line of U.S. Highway 99 and South of the Easterly extension of the North line of the access entrance opposite Engineer's Station 20+15 on Division of Highway's Survey of said U.S. Highway 99

9. An easement for the purpose shown below and rights incidental thereto as set forth in a document

Purpose:           sewer lines
Recorded:          February 8,1971 in Book 1304, Page 503, of Official Records
Affects:           said land

Affects: Portions of the herein described land, the exact location of which can be determined by examination of the above-mentioned instrument, which contains a complete legal description of the affected portions of said land.

10. Any boundary discrepancies, rights or claims which may exist or arise as disclosed by a Record of Survey

Recorded                  in Book 12, page 45 of Records of Survey

11. The fact that said land is included within a project area of the Redevelopment Agency shown below, and that proceedings for the redevelopment of said project have been instituted under the Redevelopment law (such redevelopment to proceed only after the adoption of the redevelopment plan) as disclosed by a document.

Redevelopment Agency:   El Centro Redevelopment Project
Recorded:               December 14, 1994 in Book 1792, Page 823, of Official Records

## END OF SCHEDULE B EXCEPTIONS

## PLEASE REFER TO THE "NOTES AND REQUIREMENTS SECTION" WHICH FOLLOWS FOR INFORMATION NECESSARY TO COMPLETE THIS TRANSACTION

405 D

File No:  05720926

# REQUIREMENTS SECTION:

REQ NO.1:  ·    This Company will require that a full copy of any unrecorded agreement, contract or lease be submitted to us, together with all supplements, assignments and amendments, before any policy of title insurance will be issued.

406 D

File No:  05720926

# INFORMATIONAL NOTES SECTION

NOTE NO. 1:   The information on the attached plat is provided for your convenience as a guide to the general location of the subject property.  The accuracy of this plat is not guaranteed, nor is it a part of any policy, report or guarantee to which it may be attached.

NOTE NO. 2:   California insurance code section 12413.1 regulates the disbursement of escrow and sub-escrow funds by title companies. The law requires that funds be deposited in the title company escrow account and available for withdrawal prior to disbursement. Funds deposited with the company by wire transfer may be disbursed upon receipt. Funds deposited with the company via cashier's check or teller's check drawn on a California based bank may be disbursed on the next business day after the day of deposit. If funds are deposited with the company by other methods, recording and/or disbursement may be delayed.  All escrow and sub-escrow funds received by the company will be deposited with other escrow funds in one or more non-interest bearing escrow accounts of the company in a financial institution selected by the company. The company may receive certain direct or indirect benefits from the financial institution by reason of the deposit of such funds or the maintenance of such accounts with such financial institution, and the company shall have no obligation to account to the depositing party in any manner for the value of, or to pay to such party, any benefit received by the company. Those benefits may include, without limitation, credits allowed by such financial institution on loans to the company or its parent company and earnings on investments made with the proceeds of such loans, accounting, reporting and other services and products of such financial institution. Such benefits shall be deemed additional compensation of the company for its services in connection with the escrow or sub-escrow.

**WIRING INSTRUCTIONS FOR THIS OFFICE ARE:**

**Union Bank of California**
**445 South Figueroa Street**
**Los Angeles, CA  90071-1655**
**Phone (800) 218-6466**
**ABA #122-000-496**
**Credit To:  Commonwealth Land Title Company – Commercial Services**
**Account #9100511654**

**RE:     05720926 988  - D3S**

**PLEASE INDICATE COMMONWEALTH LAND TITLE COMPANY ESCROW OR TITLE ORDER NUMBER**

NOTE NO. 3:   The charges which the company will make for next day messenger services (i.e. Federal Express, UPS, DHL, Airborne, Express mail, etc.) Are $15.00 per letter, standard overnight service, and $25.00 for larger size packages and/or priority delivery services.  Such charges include the cost of such messenger service and the company's expenses for arranging such messenger service and its overhead and profit.  Special messenger services will be billed at the cost of such services.  There will be no additional charge for pick-up or delivery of packages via the company's regularly scheduled messenger runs.

407 D

File No: 05720926

NOTE NO. 4.    The charge for a policy of title insurance, when issued through this title order, will be based on BASIC RATE.

NOTE NO. 5.    THIS COMPANY REQUIRES CURRENT BENEFICIARY DEMANDS PRIOR TO CLOSING. If the demand is expired and a current demand cannot be obtained, our requirements will be as follows:

(a)    If this Company accepts a verbal update on the demand, we may hold an amount equal to one monthly mortgage payment.  This hold will be in addition to the verbal hold the lender may have stipulated.

(b)    If this Company cannot obtain a verbal update on the demand, we will either pay off the expired demand, or wait for the amended demand, at our discretion.

(c)    All payoff figures are verified at closing. If the customer's last payment was made within 15 days of closing, our Payoff Department may hold one month's payment to insure check has cleared the bank (unless a copy of the cancelled check is provided, in which case there will be no hold).


Typist: rh3
Date Typed: April 12, 2007

408 D

**Exhibit B (Revised 11-17-06)**

### CALIFORNIA LAND TITLE ASSOCIATION
### STANDARD COVERAGE POLICY – 1990
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building or zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy; or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.
4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.
5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.
6. Any claim, which arises out of the transaction vesting in the insured the estate of interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

### EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART I

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
   Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.
2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.
3. Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

### CLTA HOMEOWNER'S POLICY OF TITLE INSURANCE (10/22/03)
### ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE
### EXCLUSIONS

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1. Governmental police power, and the existence or violation of any law or government regulation. This includes ordinances, laws and regulations concerning:
   a. building
   b. zoning
   c. Land use
   d. improvements on the Land
   e. Land division
   f. environmental protection
   This Exclusion does not apply to violations or the enforcement of these matters if notice of the violation or enforcement appears in the Public Records at the Policy Date.
   This Exclusion does not limit the coverage described in Covered Risk 14, 15, 16, 17 or 24.

409 D

File No: 05720926

2. The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes. This Exclusion does not apply to violations of building codes if notice of the violation appears in the Public Records at the Policy Date.
3. The right to take the Land by condemning it, unless:
   a. a notice of exercising the right appears in the Public Records at the Policy Date; or
   b. the taking happened before the Policy Date and is binding on You if You bought the Land without Knowing of the taking.
4. Risks:
   a. that are created, allowed, or agreed to by You, whether or not they appear in the Public Records;
   b. that are Known to You at the Policy Date, but not to Us, unless they appear in the Public Records at the Policy Date;
   c. that result in no loss to You; or
   d. that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.d, 22, 23, 24 or 25.
5. Failure to pay value for Your Title.
6. Lack of a right:
   a. to any Land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
   b. in streets, alleys, or waterways that touch the Land.
   This Exclusion does not limit the coverage described in Covered Risk 11 or 18.

## LIMITATIONS ON COVERED RISKS

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:
   • For Covered Risk 14, 15, 16 and 18, Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.
The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

| | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 14: | 1% of Policy Amount or $2,500 (whichever is less) | $10,000 |
| Covered Risk 15: | 1% of Policy Amount or $5,000 (whichever is less) | $25,000 |
| Covered Risk 16: | 1% of Policy Amount or $5,000 (whichever is less) | $25,000 |
| Covered Risk 18: | 1% of Policy Amount or $2,500 (whichever is less) | $5,000 |

## AMERICAN LAND TITLE ASSOCIATION
## RESIDENTIAL TITLE INSURANCE POLICY (6-1-87)
## EXCLUSIONS

In addition to the Exceptions in Schedule B, you are not insured against loss, costs, attorneys' fees, and expenses resulting from:
1. Governmental police power, and the existence or violation of any law or government regulation. This includes building and zoning ordinances and also laws and regulations concerning:
   • land use
   • improvements on the land
   • land division
   • environmental protection
   This exclusion does not apply to violations or the enforcement of these matters which appear in the public records at Policy Date. This exclusion does not limit the zoning coverage described in Items 12 and 13 of Covered Title Risks.
2. The right to take the land by condemning it, unless:
   • a notice of exercising the right appears in the public records on the Policy Date
   • the taking happened prior to the Policy Date and is binding on you if you bought the land without knowing of the taking
3. Title Risks:
   • that are created, allowed, or agreed to by you
   • that are known to you, but not to us, on the Policy Date -- unless they appeared in the public records
   • that result in no loss to you
   • that first affect your title after the Policy Date -- this does not limit the labor and material lien coverage in Item 8 of Covered Title Risks
4. Failure to pay value for your title.
5. Lack of a right:
   • to any land outside the area specifically described and referred to in Item 3 of Schedule A
      OR
   • in streets, alleys, or waterways that touch your land
   This exclusion does not limit the access coverage in Item 5 of Covered Title Risks.

## AMERICAN LAND TITLE ASSOCIATION LOAN POLICY (10-17-92)
## WITH ALTA ENDORSEMENT-FORM 1 COVERAGE
## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:
1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land; (ii) the

410 D

File No: 05720926

character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

(b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy (except to the extent that this policy insures the priority of the lien of the insured mortgage over any statutory lien for services, labor or material or to the extent insurance is afforded herein as to assessments for street improvements under construction or completed at Date of Policy); or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage.

4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the land is situated.

5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6. Any statutory lien for services, labor or materials (or the claim of priority of any statutory lien for services, labor or materials over the lien of the insured mortgage) arising from an improvement or work related to the land which is contracted for and commenced subsequent to Date of Policy and is not financed in whole or in part by proceeds of the indebtedness secured by the insured mortgage which at Date of Policy the insured has advanced or is obligated to advance.

7. Any claim, which arises out of the transaction creating the interest of the mortgagee insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:
   (i) the transaction creating the interest of the insured mortgagee being deemed a fraudulent conveyance or fraudulent transfer; or
   (ii) the subordination of the interest of the insured mortgagee as a result of the application of the doctrine or equitable subordination; or
   (iii) the transaction creating the interest of the insured mortgagee being deemed a preferential transfer except where the preferential transfer results from the failure:
      (a) to timely record the instrument of transfer; or
      (b) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following General Exceptions:

## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
   Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

2. Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

3. Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.

4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

## 2006 ALTA LOAN POLICY (06-17-06)
## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
   (i)   the occupancy, use, or enjoyment of the Land;
   (ii)  the character, dimensions, or location of any improvement erected on the Land;
   (iii) the subdivision of land; or
   (iv)  environmental protection;
   or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.

411 D

File No: 05720926

(b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain.  This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 11, 13, or 14); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.
4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of an Insured to comply with applicable doing-business laws of the state where the Land is situated.
5. Invalidity or unenforceability in whole or in part of the lien of the Insured Mortgage that arises out of the transaction evidenced by the Insured Mortgage and is based upon usury or any consumer credit protection or truth-in-lending law.
6. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction creating the lien of the Insured Mortgage, is
   (a) a fraudulent conveyance or fraudulent transfer, or
   (b) a preferential transfer for any reason not stated in Covered Risk 13(b) of this policy.
7. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the Insured Mortgage in the Public Records.  This Exclusion does not modify or limit the coverage provided under Covered Risk 11(b).

The above policy form may be issued to afford either Standard Coverage or Extended Coverage.  In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of:
1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the Public Records.

## AMERICAN LAND TITLE ASSOCIATION OWNER'S POLICY (10-17-92)
## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:
1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the land;  (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.
2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.
3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy; or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the estate or interest insured by this policy.
4. Any claim, which arises out of the transaction vesting in the insured the estate or interest insured by this policy, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that is based on:
   (i) the transaction creating the estate or interest insured by this policy being deemed a fraudulent conveyance or fraudulent transfer; or

412 D

File No: 05720926

(ii) the transaction creating the estate or interest insured by this policy being deemed a preferential transfer except where the preferential transfer results from the failure:
(a) to timely record the instrument of transfer; or
(b) of such recordation to impart notice to a purchaser for value or a judgment or lien creditor.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage Policy will also include the following General Exceptions:

## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:
1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
   Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.
2. Any facts, rights, interests or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.
3. Easements, liens or encumbrances, or claims thereof, which are not shown by the public records.
4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

## 2006 ALTA OWNER'S POLICY (06-17-06)
## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:
1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
   (i)  the occupancy, use, or enjoyment of the Land;
   (ii)  the character, dimensions, or location of any improvement erected on the Land;
   (iii) the subdivision of land; or
   (iv) environmental protection;
   or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
   (a) created, suffered, assumed, or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or
   (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.
4. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is
   (a) a fraudulent conveyance or fraudulent transfer; or
   (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.
5. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

The above policy form may be issued to afford either Standard Coverage or Extended Coverage. In addition to the above Exclusions from Coverage, the Exceptions from Coverage in a Standard Coverage policy will also include the following Exceptions from Coverage:

## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of:
1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown by the Public Records but that could be ascertained by an inspection of the Land or that may be asserted by persons in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records.
4. Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the Public Records.

413 0

File No: 05720926

## ALTA EXPANDED COVERAGE RESIDENTIAL LOAN POLICY (10/13/01)
## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building and zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating to (i) the occupancy, use, or enjoyment of the Land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the Land; (iii) a separation in ownership or a change in the dimensions or areas of the Land or any parcel of which the Land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that s notice of the enforcement thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy. This exclusion does not limit the coverage provided under Covered Risks 12, 13, 14, and 16 of this policy.

   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or a notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the Land has been recorded in the Public Records at Date of Policy. This exclusion does not limit the coverage provided under Covered Risks 12, 13, 14, and 16 of this policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the Public Records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without Knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) created, suffered, assumed or agreed to by the Insured Claimant;
   (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   (c) resulting in no loss or damage to the Insured Claimant;
   (d) attaching or created subsequent to Date of Policy (this paragraph does not limit the coverage provided under Covered Risks 8, 16, 18, 19, 20, 21, 22, 23, 24, 25 and 26); or
   (e) resulting in loss or damage which would not have been sustained if the Insured Claimant had paid value for the Insured Mortgage.

4. Unenforceability of the lien of the Insured Mortgage because of the inability or failure of the Insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with applicable doing business laws of the state in which the Land is situated.

5. Invalidity or unenforceability of the lien of the Insured Mortgage, or claim thereof, which arises out of the transaction evidenced by the Insured Mortgage and is based upon usury, except as provided in Covered Risk 27, or any consumer credit protection or truth in lending law.

6. Real property taxes or assessments of any governmental authority which become a lien on the Land subsequent to Date of Policy. This exclusion does not limit the coverage provided under Covered Risks 7, 8(e) and 26.

7. Any claim of invalidity, unenforceability or lack of priority of the lien of the Insured Mortgage as to advances or modifications made after the Insured has Knowledge that the vestee shown in Schedule A is no longer the owner of the estate or interest covered by this policy. This exclusion does not limit the coverage provided in Covered Risk 8.

8. Lack of priority of the lien of the Insured Mortgage as to each and every advance made after Date of Policy, and all interest charged thereon, over liens, encumbrances and other matters affecting the title, the existence of which are Known to the Insured at:
   (a) The time of the advance; or
   (b) The time a modification is made to the terms of the Insured Mortgage which changes the rate of interest charged, if the rate of interest is greater as a result of the modification than it would have been before the modification. This exclusion does not limit the coverage provided in Covered Risk 8.

9. The failure of the residential structure, or any portion thereof to have been constructed before, on or after Date of Policy in accordance with applicable building codes. This exclusion does not apply to violations of building codes if notice of the violation appears in the Public Records at Date of Policy.

414 D



Commonwealth Land Title Company
750 "B" Street
Suite 3000
San Diego, CA 92101
Phone: (619) 233-3000

File No: 05720926

# Notice to Customers

You may be eligible for a $20.00 reduction in your title or escrow fees in this transaction charged by **Commonwealth Land Title Insurance Company** pursuant to the Final Judgments entered in People of the State of California v. LandAmerica Financial Group, Inc., et al., Sacramento Superior Court Case No. 92 AS 06111, and Taylor, et al. v. LandAmerica Financial Group, Inc., et al., Los Angeles Superior Court Case No. BC 231917. You are eligible for this $20.00 reduction in your title or escrow fees if you meet the following requirements:

1. You are a natural person or trust;
2. Your transaction involves the purchase, sale or refinancing of residential real property containing one-to-four-dwelling units;
3. You previously purchased title insurance or escrow services involving a transaction which closed between May 19, 1995 and October 8, 2002 from one of the following companies:

   LandAmerica Financial Group, Inc.
   Commonwealth Land Title Insurance Company or
   Commonwealth Land Title Company
   Lawyers Title Insurance Corporation or Lawyers Title Company
   First American Title Insurance Company, First American Title Company, First American Title Guarantee Company
   Fidelity National Financial, Inc.
   Fidelity National Title Insurance Company
   Fidelity National Title Company
   Fidelity National Title Insurance Company of California, Inc.
   Fidelity National Loan Portfolio Services
   Ticor Title Insurance Company
   Security Union Title Insurance Company
   Chicago Title Insurance Company
   Chicago Title Company
   Chicago Title and Trust Company
   Rocky Mountain Support Services, Inc.
   California Tracking Service, Inc.
   Title Accounting Services Corporation

4. You did not receive a $65.00 cash payment from LandAmerica Financial Group, Inc. in the reconveyance fee claims process pursuant to the Final Judgments entered in People of the State of California v. LandAmerica Financial Group, Inc., et al., Sacramento Superior Court Case No. 92 AS 06111, and Taylor, et al. v. LandAmerica Financial Group, Inc., et al., Los Angeles Superior Court Case No. BC 231917.

If you meet the foregoing requirements and want the $20.00 fee reduction complete this form and return it to your **Commonwealth Land Title Insurance Company** escrow or title officer. **NOTE: If you are eligible for the $20.00 fee reduction please complete and return this form. You must advise us of your eligibility prior to closing in order to receive the $20.00 fee reduction.**

Name: _____

Address: _____

Telephone No: _____

415 D

416 D



**LandAmerica**
**Commonwealth**

Commonwealth Land Title Company
750 "B" Street
Suite 3000
San Diego, CA 92101
Phone: (619) 233-3000

File No: 05720926

# Notice to Customers

You may be eligible for a $20.00 reduction in your title or escrow fees in this transaction charged by **Commonwealth Land Title Insurance Company** pursuant to the Final Judgments entered in <u>People of the State of California v. LandAmerica Financial Group, Inc., et al.,</u> Sacramento Superior Court Case No. 92 AS 06111, and <u>Taylor, et al. v. LandAmerica Financial Group, Inc., et al.,</u> Los Angeles Superior Court Case No. BC 231917.  You are eligible for this $20.00 reduction in your title or escrow fees if you meet the following requirements:

1. You are a natural person or trust;
2. Your transaction involves the purchase, sale or refinancing of residential real property containing one-to-four-dwelling units;
3. You previously purchased title insurance or escrow services involving a transaction which closed between May 19, 1995 and October 8, 2002 from one of the following companies:

    LandAmerica Financial Group, Inc.
    Commonwealth Land Title Insurance Company or
    Commonwealth Land Title Company
    Lawyers Title Insurance Corporation or Lawyers Title Company
    First American Title Insurance Company, First American Title Company, First American Title Guarantee Company
    Fidelity National Financial, Inc.
    Fidelity National Title Insurance Company
    Fidelity National Title Company
    Fidelity National Title Insurance Company of California, Inc.
    Fidelity National Loan Portfolio Services
    Ticor Title Insurance Company
    Security Union Title Insurance Company
    Chicago Title Insurance Company
    Chicago Title Company
    Chicago Title and Trust Company
    Rocky Mountain Support Services, Inc.
    California Tracking Service, Inc.
    Title Accounting Services Corporation

4. You did not receive a $65.00 cash payment from LandAmerica Financial Group, Inc. in the reconveyance fee claims process pursuant to the Final Judgments entered in <u>People of the State of California v. LandAmerica Financial Group, Inc., et al.,</u> Sacramento Superior Court Case No. 92 AS 06111, and <u>Taylor, et al. v. LandAmerica Financial Group, Inc., et al.,</u> Los Angeles Superior Court Case No. BC 231917.

If you meet the foregoing requirements and want the $20.00 fee reduction complete this form and return it to your **Commonwealth Land Title Insurance Company** escrow or title officer.  **NOTE: If you are eligible for the $20.00 fee reduction please complete and return this form.  You must advise us of your eligibility prior to closing in order to receive the $20.00 fee reduction.**

Name: _____

Address: _____

Telephone No: _____

417 D

418 D



CITY OF EL CENTRO
    to
UNITED STATES OF AMERICA

Parcel 1





Recorded at request of SECURITY TITLE INSURANCE & GUARANTEE COMPANY

Apr 10 1941  10:05 A.M. in Book 541 page 91 of OFFICIAL RECORDS of Imperial County, Calif.

REALTY RECORDS, Recorder

By O. DEELING Deputy

$1.20

I certify that I have correctly transcribed this document in its entirety.

Laura Berlet, Copyist

Affix I. R. S. $3.50

RALPH G. WOLFF CO.

to                    CORPORATION GRANT DEED

RICHARD S. EMERSON et al.

In consideration of TEN DOLLARS of which the RALPH G. WOLFF

CO., a corporation organized and existing under the laws of the State of California

and having its principal place of business at Los Angeles, does hereby GRANT to

RICHARD S. EMERSON and LELIA M. EMERSON, husband and wife, as to an

undivided one-half interest; and ...... BRUN and .... BRUN, husband and wife, as

Joint Tenants, as to an undivided one-half interest, all that real property in the

Imperial, State of California, described as follows:

          Lots Twenty-three (23) and Twenty-four (24) in Block ...
          Subdivision of Block Eleven (11) in the City of ...
          California, according to the map thereof on file in the office
          of the County Recorder of Imperial County.

Subject to street assessments and taxes for the fiscal year 1941-42.

Subject to conditions, restrictions, reservations, easements, rights, and
rights of way of record.

Together with all and singular the tenements, hereditaments, and appurtenances
thereunto belonging or in anywise appertaining.

IN WITNESS WHEREOF, said Grantor has caused its corporate name and seal to be
affixed hereto by its President and Secretary thereunto duly authorized, this third day
of April, 1941.

                                        RALPH G. WOLFF CO.
                                        By Ralph G. Wolff  President
                                        By A. B. Davis     Secretary

          (CORPORATE SEAL)

U.S.I.R.S. $3.50 Cancelled
W B C  4-10-41

State of California     ) ss.
County of Los Angeles  )

     On this Fourth day of April 1941, before me, M. F. Wilson, a Notary Public in
and for said County, personally appeared Ralph G. Wolff, known to me to be the President
and A. B. Davis, known to me to be the Secretary of the RALPH G. WOLFF CO., the corpora-
tion that executed the within and foregoing instrument, and known to me to be the persons
who executed the within instrument on behalf of the corporation therein named, and
acknowledged to me that such corporation executed the same.

     WITNESS my hand and official seal the day and year in this certificate first
above written.

                                        M. F. Wilson Notary Public in and
                                        for said County and State
                                        My commission expires Sept. 29, 1943.

          (NOTARIAL SEAL)

420 D



BOOK 1302 PAGE 414
JOHN W. KENDERSON
COUNTY RECORDER

70 DEC 18 AM 8:18
BOOK 1302 PAGE 414
OFFICIAL RECORDS
IMPERIAL COUNTY, CALIF.

Security Title Insurance

United States Department of Justice,
United States Attorney,
325 Courthouse
San Diego, California

parcel 2

## Grant Deed

THIS FORM FURNISHED BY SECURITY TITLE INSURANCE COMPANY

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

COUNTY OF IMPERIAL

hereby GRANT(S) to    THE UNITED STATES OF AMERICA, DEPARTMENT OF JUSTICE,
INMIGRATION AND NATURALIZATION SERVICE

the following described real property in the
county of    Imperial    state of California;

Description attached hereto and made a part hereof.

Dated    November 3, 1970    County of Imperial

STATE OF CALIFORNIA

421 D

State of California }
County of Imperial } ss.

On this ___ th day of ___ November ___ 19 70, before me

DESCRIPTION

Parcel 3

That portion of the Northwest...

422 D

UNITED STATES DEPARTMENT OF JUSTICE
IMMIGRATION AND NATURALIZATION SERVICE
TERMINAL ISLAND
SAN PEDRO, CALIFORNIA 90731

December 15, 1970    RECEIVED

DEC 17 1970

423 D